**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| **DASHA LONG,** | ) |
| *individually and on behalf* | ) |
| *of her minor children, M.L. and L.L.,* | ) |
| *as mother and general guardian* | ) |
| 4201 Massachusetts Avenue NW | ) |
| Washington, DC 20016, | ) |
| | ) |
| and | ) |
| | ) |
| **M.L.**, *a minor child* | ) |
| 4201 Massachusetts Avenue NW | ) |
| Washington, DC 20016 | ) |
| | ) |
| and | ) |
| | ) |
| **L.L.**, *a minor child* | ) |
| 4201 Massachusetts Avenue NW | ) |
| Washington, DC 20016 | ) |
| | ) |
| *Plaintiffs* | ) **Case No. 1:21-cv-00881** |
| | ) |
| v. | ) **JURY TRIAL DEMANDED** |
| | ) |
| **GABLES RESIDENTIAL** | ) |
| 8300 Greensboro Drive, Suite 650 | ) |
| McLean, VA 22102 | ) |
| | ) |
| | ) |
| *Defendant* | ) |

---

## COMPLAINT AND JURY DEMAND

## PRELIMINARY STATEMENT

1.     This action arises out of the hostile housing environment that Plaintiff Dasha Long ("Ms. Long") has been subjected to on the basis of her race and familial status by residents and staff of The Berkshire Apartments ("The Berkshire") since shortly after she moved into her

apartment in April 2020.  Ms. Long's prior residence was a homeless shelter.  Defendant Gables Residential ("Gables") has at all relevant times managed The Berkshire.

2.     Gables and its on-site property management staff of The Berkshire, who are agents of Gables, knew of the harassment Ms. Long was experiencing at the hands of a neighbor.  And, not only did Gables and its agents fail to stop it, they subsequently enabled the neighbor's harassment and exacerbated Ms. Long's hostile housing environment through Gables' own problematic and unlawful actions, in violation of the Fair Housing Act and District of Columbia Human Rights Act.  In two such egregious instances, Gables' agents facilitated the Metropolitan Police Department of the District of Columbia's ("MPD" or "police") entry into Ms. Long's apartment without a warrant or Ms. Long's consent, in violation of Gables' lease obligations.  The first such instance occurred when MPD responded to a baseless 911 call regarding allegedly disruptive behavior in Ms. Long's household; the second when MPD tried to serve a barring notice on an individual who was neither present in Ms. Long's apartment, nor a resident thereof.

3.     The Berkshire is an upscale building in Ward 3 of Washington, D.C., an historically white part of the city where African-American continue to be underrepresented as residents.  Ms. Long and her children are African American, and from Ms. Long's observations, she and her family are one of the few African-American households in the building.

4.     *The day after she moved in*, Ms. Long overheard her neighbor talking to an employee of The Berkshire, asking why they were allowing "Black people" to live there and requesting that Ms. Long be moved to another floor.  Thereafter, the same neighbor continuously harassed Ms. Long and called the police on her numerous times on the grounds that Ms. Long's baby was crying.  Ms. Long alerted Gables of the harassing conduct by her neighbor, but despite being on notice of the harassment, Gables and its agents did nothing to stop the behavior or

otherwise shield Ms. Long from her neighbor, who complained about Ms. Long's race from the outset.

5.      In recent months, Gables facilitated further harassment by different neighbors, who live down the hall from Ms. Long and harassed her because of her children.

6.      The Berkshire staff enabled the unlawful behavior of Ms. Long's neighbor by repeatedly granting the police entry into Ms. Long's unit, without her permission or notice, in situations where MPD did not have a warrant.  For example, after Ms. Long's neighbor called 911 complaining that Ms. Long's infant was crying, in what became a pattern of harassment, an employee of The Berkshire opened Ms. Long's apartment door – at 2:30 a.m. – to let the police into Ms. Long's apartment, where MPD then demanded that Ms. Long wake her sleeping baby. The Berkshire staff engaged in this behavior on more than one occasion, even after Ms. Long asked that they refrain from facilitating the harassment by permitting MPD to enter her apartment without her consent.

7.      Ms. Long's multiple complaints to The Berkshire staff have proved fruitless.  In April 2020, The Berkshire's property manager told Ms. Long that her crying baby was not her neighbor's problem and threatened Ms. Long with a 30-day notice if her baby continued to cry at night, as though Ms. Long (or her baby) were intentionally disturbing Ms. Long's neighbor.  This harassment of Ms. Long has impacted her, her children, and her housing stability.  Because Ms. Long is afraid of being evicted and forced back into the shelter system, this harassment has pushed her and her children to often sleep at a friend or family's residence, or occasionally at a hotel, rather than at their apartment at The Berkshire.

8.      The Berkshire staff has also retaliated against Ms. Long by refusing to communicate with her about routine landlord/tenant issues, including by ignoring ordinary

maintenance requests after Ms. Long complained about the treatment she had experienced and retained counsel.

9.      This repeated and prolonged harassment of Ms. Long and her family in her home at the hands and acquiescence of Gables and its agents has caused Ms. Long to suffer substantial physical and emotional distress, and, ultimately, forced Ms. Long to feel that she must move out of her own home.  Indeed, on November 6, 2020, Ms. Long gave The Berkshire notice that she intended to vacate her apartment as soon as she was able to locate other suitable housing.  To this date, Ms. Long continues to search for new and adequate housing.

10.     Accordingly, Ms. Long brings this civil rights action for declaratory relief, injunctive relief, and money damages due to the severe, pervasive, hostile, and unwelcome conduct and retaliation she and her children have experienced at The Berkshire, and on behalf of two of her minor children, for the physical injuries and pain and suffering they endured as a result of Gables' negligence.

## **PARTIES**

11.     Plaintiff Dasha Long is a 20-year old African-American female and resident of the District of Columbia.  At all times relevant to this Complaint, Ms. Long has resided in Unit 4015 at The Berkshire Apartments at 4201 Massachusetts Avenue NW, Washington, DC 20016, with her three children, ages 5 months, 1 year old, and 3 years old.  Her third child has resided in the apartment with Ms. Long since he was born in October 2020.

12.     Plaintiff M.L., a minor child, is Ms. Long's eldest child.

13.     Plaintiff L.L., a minor child, is Ms. Long's youngest child.

14.     Defendant Gables Residential is a property management company that owns, develops, and manages multi-family, luxury, and mixed-use communities around the country.

Gables owns and manages The Berkshire. It maintains a regional office that serves the D.C. Metropolitan area, located at 8300 Greensboro Drive, Suite 650, McLean, Virginia 22102. The Berkshire is one of nine multi-unit residential buildings managed by Gables in the Washington, D.C. Metropolitan Area.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(3)-(4) because Plaintiff, Ms. Long, asserts violations of federal civil rights statutes, specifically the Fair Housing Act ("FHA"), 42 U.S.C. § 3613, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

16.    This Court has supplemental jurisdiction over claims asserted under the laws of the District of Columbia and common law under 28 U.S.C. § 1367 because these claims are so related to Ms. Long's federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

17.    This Court has personal jurisdiction over the out-of-state Defendant pursuant to D.C. Code § 13-423, as Defendant conducts business in the District—namely, by managing The Berkshire—and the discriminatory conduct arises out of these business activities.

18.    This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-02.

19.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because all of the events giving rise to the claims herein occurred within the District of Columbia.

## FACTUAL BACKGROUND

### A.     Dasha Long Faces Harassment at The Berkshire

20.     On April 9, 2020, Ms. Long and her two oldest children, a 2-year-old and 11-month-old infant at the time, moved into Unit 4015 at The Berkshire under a 12-month lease.  *See* Ex. A hereto, Apartment Lease Contract (the "Lease").

21.     Upon information and belief, Ms. Long and her children are the only family on the floor of her building.

22.     Ms. Long is a participant in the Rapid Re-Housing program,[1] a multiagency federal government program that connects families experiencing homelessness to permanent housing. The Rapid Re-Housing program provides Ms. Long with financial assistance to cover her rent.

23.     At all times since Ms. Long has resided at the property, Gables has owned and managed The Berkshire.   The Berkshire property management staff, including its property manager and front desk concierge, handle The Berkshire's day-to-day operations and are Gables' agents.

24.     As an operator of residential real estate, Gables is required to comply with anti-discrimination laws under the FHA and DC Human Rights Act ("DCHRA").  42 U.S.C. § 3601 *et seq.*; D.C. Code 2-1401 *et seq.*

25.     As a tenant who has signed a lease with Gables, Ms. Long is required to adhere to all lease provisions governing tenant conduct and responsibilities.  Conversely, the landlord must adhere to all landlord obligations, as outlined in the lease or otherwise required by law.

---

[1]     The Rapid Re-Housing program is a research-based intervention designed to help individuals and families quickly exit homelessness and return to permanent housing (https://dhs.dc.gov/service/solutions-ending-homelessness).

26.    Upon information and belief, any tenant who resides at The Berkshire has signed a lease with Gables governing rentals at The Berkshire and must comply with all Gables' lease obligations as a result.

27.    Upon information and belief, all Gables' agents, including onsite staff at The Berkshire, are expected to become familiar with, and abide by, the terms of Gables' lease for rentals at The Berkshire, including terms regarding permissible entry into tenants' units.

28.    The provisions of the Lease that govern noise and interference with other tenants' comfort state, in pertinent part:

**15.    LIMITATIONS ON CONDUCT.**

[...]

*We may exclude from the apartment community guests, visitors or others who, in our judgment, have been* violating the law, violating this Lease Contract or any apartment rules and community policies, or *disturbing other tenants, neighbors,* visitors, or owner representatives.

[…]

**PROHIBITED CONDUCT.** You and your occupants, guests or visitors may not engage in the following activities: *behaving in a loud or obnoxious manner*; *disturbing* or threatening *the rights, comfort,* health, safety, *or convenience of others (including our agents and employees) in or near the apartment community*; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; possessing any firearm whether or not in compliance with all laws and regulations; discharging a firearm in the Apartment or apartment community; displaying or possessing a gun, knife, or other weapon in the Apartment or common area; storing anything in closets having gas appliances; tampering with utilities or telecommunications; or bringing hazardous materials into the apartment community.

(Emphasis added).

29.    Gables Residential Policies and Regulations (the "Gables Policies") additionally govern the conduct of The Berkshire's tenants.  In pertinent part, the Gables Policies state:

7

**Noise**

For the mutual enjoyment of all residents, we ask everyone's cooperation in keeping the volume of stereos, televisions, and musical instruments at a level that cannot be heard by your neighbors.

**Loitering and Disturbances**

*We ask that all residents*, occupants, and their guests *not disturb other neighbors* or damage the landscaping, buildings, or property in any manner. This includes both temporary and permanent defacement.

(Emphasis added).

30.     Neither the Lease nor the Gables Policies state that an infant crying in the middle of the night violates the noise provision or can be considered to "disturb[] . . . the "comfort[] . . . or convenience of others." Nor do the lease or the Gables Policies otherwise address that particular situation.

31.     The Lease and Gables Policies do, however, clearly prohibit tenants from engaging in certain conduct that "disturb[s]" the "comfort" or "convenience" of others, including their neighbors.

32.     Since the first night that Ms. Long moved into her apartment at The Berkshire, any time her children made noise during the night, her adjacent neighbor, in Unit 4016, banged on the wall of Ms. Long's apartment violently, in violation of the Lease. The same neighbor also repeatedly complained to management about Ms. Long's infant crying, the volume of Ms. Long's TV, and even Ms. Long's very presence in the building.

33.     Specifically, on or about April 10, 2020, a mere day after Ms. Long moved into The Berkshire, the very same neighbor made an explicitly racist remark in reference to Ms. Long, which Ms. Long happened to overhear. The neighbor said: "Why do you guys have Black people living here?" In the same conversation, the neighbor asked The Berkshire staff to relocate Ms. Long and her family to a different floor of the building.

8

**B.    Neighbor's Multiple 911 Calls about Ms. Long's Crying Baby and Related Unauthorized Entries into Ms. Long's Unit**

34.    The same neighbor who complained about Ms. Long's crying infant proceeded to call the police four times in April and May 2020 to complain about Ms. Long's baby crying during the night, and called the police a fifth time to complain about Ms. Long's children making noise during the day.  All of this occurred within a few weeks of Ms. Long having moved into her unit.

35.    Ms. Long conveyed her distress regarding her neighbor's harassing conduct to Gables' agents at The Berkshire.  Rather than address or try to mitigate one resident's harassment of another, Gables ***enabled*** the neighbor's harassing conduct.  In particular, Gables failed to investigate the veracity of Ms. Long's neighbor's complaints and failed to put an end to the neighbor's unreasonable actions towards Ms. Long, even though Gables had the authority to do so, knew the neighbor's behavior violated the terms of Gables' lease for residents of The Berkshire, knew or should have known that such racially based discrimination violated Ms. Long's civil rights, and knew of the deleterious effect the neighbor's behavior was having on Ms. Long and her young children.

36.    Further, in response to at least one of the neighbor's 911 calls regarding Ms. Long's crying infant, a Gables agent opened Ms. Long's door and permitted MPD to enter Ms. Long's unit without a warrant, in violation of the Lease, which states, in pertinent part:

**23.    WHEN WE MAY ENTER.**

A. *Except in the event of an emergency* for the protection or preservation of the Apartment, or *for the protection and safety of the tenants or other persons, the Landlord may enter the Apartment during the Tenant's tenancy only for a reasonable purpose, at a reasonable time, and after having provided the Tenant with reasonable notice.*

B. "Reasonable notice" means written notice provided to the Tenant *at least 48 hours before the time the Landlord wishes to enter the Apartment or a shorter period of time as agreed to by the Tenant in writing.* Written notice may include electronic communication including email and mobile text messaging, provided

9

that if the Tenant fails to furnish a written acknowledgment, the Landlord will provide a paper notice.

C. "Reasonable time" means *a time between the hours of 9 a.m. and 5 p.m.*, and not on a Sunday or federal holiday, or at another time agreed upon by the Tenant.

D. "Reasonable purpose" means a purpose that is directly related to the Landlord's duty to keep the Apartment Community safe from damage, to inspect the Apartment, make necessary or agreed repairs, decorations, alteration, renovations or improvements, supply necessary or agreed services, maintenance, or exhibit the Apartment to prospective or actual purchasers, mortgagees, tenants, workmen or contractors or to gain entry for work ordered by a governmental agency.

[…]

*You hereby expressly permit our access to your Apartment by the owner, management, or by its/their agent(s) in circumstances which may include, but are not limited to the following*: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke detector batteries; retrieving unreturned tools, equipment or appliances; preventing waste of utilities; exercising our contractual lien; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or security devices; removing or re-keying unauthorized locks or security devices; removing unauthorized window coverings; stopping excessive noise; removing health or safety hazards (including hazardous materials), or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected and you fail to remove them; retrieving property owned or leased by former tenants; inspecting when immediate danger to person or property is reasonably suspected; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); *allowing entry by a law enforcement officer <u>with a search or arrest warrant</u>, or in hot pursuit*; showing apartment to prospective tenants (after move-out or vacate notice has been given); or showing apartment to government inspectors, fire marshals, lenders, appraisers, contractors, prospective buyers, or insurance agents.

(Emphasis added).

37.    The first of the MPD incidents was the most egregious.  On or about April 11, 2020, at approximately 2:30 am, Ms. Long and her children were asleep in their respective bedrooms. Ms. Long was awakened by a loud banging noise on the door inside the apartment that connects the living room to a hallway leading to the bedroom.  When she opened her bedroom door to

investigate, she found MPD officers in her home.  Ms. Long later learned directly from MPD that The Berkshire concierge had facilitated the officers' entry into her unit.

38.    Ms. Long was startled by MPD's presence and asked why MPD officers were in her apartment.  The officers alleged that Ms. Long's neighbor had called 911 to complain about noise from Ms. Long's apartment—specifically, Ms. Long's crying infant.

39.    MPD officers indicated to Ms. Long that her neighbor stated the baby was crying for two hours and had requested that MPD conduct a wellness check.

40.    Ms. Long asked the officers to leave, but MPD refused to do so.  Instead, the officers forced Ms. Long to wake up her 11-month-old baby.  The officers left her apartment only after Ms. Long woke the sleeping infant.

41.    That the baby had stopped crying by the time MPD arrived suggests that the level of crying of Ms. Long's still-acclimating infant did not rise to the level of "excessive noise," sufficient to permit Gables to enter or allow warrantless entry into her unit.  Moreover, the neighbor's repeated behavior – of banging violently on Ms. Long's wall in response to the baby crying – certainly did not help the infant's acclimation process, nor did the entrance of multiple strangers who forced Ms. Long to wake her baby up from its sleep.

42.    At no point during or prior to the encounter with MPD did Ms. Long give her consent to having the concierge unlock her apartment door to grant MPD entry, nor did she give consent directly to MPD so they could enter her apartment.  MPD did not have a warrant to justify their entry or to support the concierge's opening of Ms. Long's door under the terms of the Lease, particularly at such an unreasonable time.

43.    Gables additionally had no basis to reasonably suspect an "immediate danger to [a] person" – here, Ms. Long's baby – that would have justified Gables' or MPD's entry to inspect

11

the wellbeing of Ms. Long's child under the Lease, when the baby had stopped crying by the time MPD arrived at Ms. Long's unit.

44.    During the April 11, 2020 incident, Ms. Long observed the concierge waiting in the hallway just outside of Ms. Long's open door.

45.    Prior to the incident, Ms. Long did not receive any calls from the concierge in an attempt to inform her that Gables would be bringing MPD officers into her apartment.  In fact, in response to Ms. Long's request for an explanation to support Gables' actions, Gables failed to provide any justification for having facilitated MPD's entry into Ms. Long's unit in the middle of the night.

46.    The same neighbor called the police at least three more times, purportedly regarding Ms. Long's crying infant, resulting in MPD visits to Ms. Long's unit at least two more times.  The same MPD officer responded to these calls and conveyed to Ms. Long that although she understood there was no issue, she had to show up in response to the neighbor's call.  The officer did not force Ms. Long to wake her baby again during subsequent visits.

47.    Later in April, the next door neighbor called the police to make an additional noise complaint when Ms. Long's sister and her sister's four children made a daytime visit.  The concierge accompanied MPD to Ms. Long's apartment door to perform a wellness check.  Ms. Long did not consent to the police entering her unit, despite their insistence, and she spoke to MPD in her apartment doorway.  MPD said the noise complaint was based on the noise level due to the six children currently present and playing.

## C.    Second Unauthorized Invasion of Ms. Long's Home to Serve a Barring Notice

48.    The harassment Ms. Long experienced did not end with the noise complaints and unwarranted 911 calls about Ms. Long's crying infant.  On April 24, 2020, while Ms. Long was in

the shower, her brother informed her that there was a knock at the door. Because Ms. Long was not expecting other guests, she told her brother not to answer the door. Once the knocking continued, Ms. Long got out of the shower and started to approach the door, wrapped in her towel.

49.     Before reaching the foyer, Ms. Long asked who was at the door. Someone on the other side stated he was making a delivery for Ms. Long. Ms. Long knew that The Berkshire did not typically permit deliveries to be made directly at residents' apartments unless the delivery was for groceries, and she had not placed any such delivery request.

50.     Ms. Long directed the person to leave the package in front of her apartment door to which the person on the other side of the door stated he had to give it directly to Ms. Long. Ms. Long stated she was undressed and could not open the door. After repeatedly requesting that the person leave the package outside of her front door, Ms. Long's door swung open from the outside in. At no point did she give her consent for anyone to enter.

51.     Startled by the door opening, Ms. Long dropped the towel and was completely unclothed. She observed the concierge and several MPD officers directly in front of her door and down the hallway. Ms. Long observed multiple uniformed MPD officers.

52.     MPD Officer C. Allen stepped into Ms. Long's apartment.

53.     Ms. Long asked MPD and the concierge to leave her home, but neither responded to her request. Instead, they stood gaping at her. Another MPD officer pulled Officer Allen out of Ms. Long's unit and into the hallway.

54.     At this point, another MPD officer threw a barring notice on the floor of Ms. Long's apartment. The barring notice stated that James Suber ("Mr. Suber"), her children's father, was prohibited from entering The Berkshire. Ms. Long stated to MPD and the concierge that the

13

barring notice could not be served on her because Mr. Suber did not live in the apartment and he was not on the Lease. MPD and the concierge did not respond to Ms. Long's statement.

55.     In sum, for the second time in a two-week period in April 2020, the Berkshire's concierge again facilitated MPD's entry into Ms. Long's apartment even though she did not provide her consent for their entry and MPD did not have a warrant, in violation of the terms of the Lease.

56.     After MPD and the concierge left, Ms. Long got dressed and went downstairs to speak to the concierge who opened her front door. She felt humiliated and violated by the group of all-male officers and the concierge who had observed her naked. Ms. Long asked the concierge who had given him permission to open her apartment door and grant the MPD officers entry into her apartment. The concierge stated that The Berkshire's manager instructed him to unlock and open the door to her apartment.

57.     Ms. Long asked the concierge for his supervisor's contact information and a copy of any incident reports made by Gables. The concierge refused to provide his supervisor's name or contact information and claimed that The Berkshire does not document police incidents involving tenants.

58.     On May 5, 2020, Ms. Long emailed the property manager, Jose Alvarado ("Mr. Alvarado"), to request an incident report and a police report pertaining to MPD's service of the barring notice. Mr. Alvarado stated that Gables was unable to produce any documents in response to Ms. Long's request.

    **D.    Ms. Long's Multiple Attempts at Informal Resolution with Defendant Gables**

59.     During the week of Tuesday, April 14, 2020, several days after Gables and MPD first intruded into Ms. Long's apartment, her social worker, Lakeda Jackson, and Ms. Jackson's

supervisor from Rapid Re-Housing, contacted the property manager, Mr. Alvarado, to inquire about the noise complaints and police incidents relating to Ms. Long.  Mr. Alvarado told Ms. Jackson that Ms. Long had to put her children to bed by 10 pm in accordance with the building's "quiet hours" policy (10 pm–6 am, daily).

60.    Neither Ms. Long's Lease nor the Gables Policies include any "quiet hours" policy or comparable set of rules.  Nor is Ms. Long aware of any "quiet hours" policy, nor is one listed on The Berkshire's website or otherwise, nor has Ms. Long's counsel been able to verify this is a real policy despite her and her counsel's best efforts.  Accordingly, upon information and belief, The Berkshire has no such "quiet hours" policy and does not equally enforce the alleged "quiet hours" policy or its "noise" Lease provision against non-family households residing at The Berkshire.

61.    Ms. Jackson asked Mr. Alvarado to contact her if another noise complaint arose concerning Ms. Long.  Mr. Alvarado agreed to contact Ms. Jackson upon receipt of any subsequent noise complaints, but Mr. Alvarado has only done so once since May 2020.

62.    After Mr. Alvarado spoke to Ms. Long's social worker, Ms. Long spoke with Mr. Alvarado, in a second attempt to resolve the noise complaint matter.  Mr. Alvarado said that his main concern was the baby crying.

63.    Ms. Long told Mr. Alvarado that she was aware the neighbor was targeting her because of her race, to which Mr. Alvarado remained silent and did not respond.  Ms. Long explained that she is a single parent of two children, which was the case at the time, and further told Mr. Alvarado that it is typical for an 11-month-old baby and a 2-year-old child to cry.

64.    In response, Mr. Alvarado said the neighbors pay to live in peace.  He made clear that Ms. Long's infant child had to stop crying because otherwise, Gables would issue her a 30-

15

day notice to quit for the alleged continued violation of the "quiet hours" policy.  Ms. Long responded that she may need to get an attorney due to Gables' unfair response to her children crying.

65.    As a result of Gables' threat to issue Ms. Long a 30-day notice, Ms. Long remained troubled by Gables' failure to take her complaints seriously and the response she received from Mr. Alvarado when she attempted to raise the serious concerns she had about the treatment she was experiencing at The Berkshire.  Consequently, she informed her social worker, Ms. Jackson, that Gables had threatened to issue her a 30-day notice in response to her attempts to informally resolve the alleged issues about her children crying.  Ms. Long also informed Ms. Jackson of the second unlawful entry into her apartment when MPD served her with a barring notice for Mr. Suber.

66.    In response to Ms. Long's report, Ms. Jackson contacted Mr. Alvarado to assist Ms. Long in reaching a resolution of the underlying issues between Ms. Long and Gables and to discuss Gables' previous threat to issue Ms. Long a 30-day notice to quit.  During this meeting, Mr. Alvarado told Ms. Jackson he wanted to evict Ms. Long and her family due to the noise from her kids.  As he continued to try and justify his desire to evict Ms. Long, Mr. Alvarado added reference to an unrelated argument between Ms. Long and Mr. Suber—an entirely different reason than the basis Mr. Alvarado had given Ms. Long, *i.e.*, that her baby continued to cry at night and disturb other tenants.  Ms. Jackson informed Gables that Ms. Long could not be evicted under Washington, D.C.'s COVID-19 emergency legislation.[2]

---

[2]    As of March 11, 2020, the District of Columbia enacted a law which prohibits evictions throughout the period of the COVID-19 public health emergency (as declared by Mayor Muriel Bowser), plus sixty (60) days.  *See, e.g.* https://ota.dc.gov/sites/default/files/dc/sites/ota/publication/attachments/2021.01.29%20OTA%20COVID-19%20and%20Tenant%20Rights-Resources.FINAL__0.pdf (last accessed March 29,

67.     Following Ms. Jackson's second attempt to resolve the issues between Ms. Long and Gables, Ms. Long spoke to Mr. Alvarado to explain that she had a 1-year old child who often cries.  Much like his prior response, Mr. Alvarado stated: "That's not everyone's problem."  He added that The Berkshire had "quiet hours" and that if Ms. Long did not follow these, she would effectively be breaking her Lease.  Again, Ms. Long's Lease contains no reference to "quiet hours."

68.     Ms. Long complained about these issues not only to Mr. Alvarado, but also to The Berkshire's concierge.  For example, on May 5, 2020, Ms. Long called the concierge to complain about her next-door neighbor's constant banging on an adjacent wall.  Ms. Long received a response to this complaint via email, in which Mr. Alvarado confirmed that he had received Ms. Long's complaint and was going to investigate the matter with Ms. Long's neighbor.  Mr. Alvarado did not follow up with Ms. Long thereafter, and Ms. Long has no indication that Gables investigated the matter further or took remedial measures to address the issue.

69.     Upon information and belief, Gables addresses complaints from The Berkshire tenants about noise violations or other disturbances initiated by fellow residents that disturb tenants of The Berkshire.  The Gables' lease for The Berkshire rentals makes it a violation of the lease for a tenant to engage in behavior that disrupts another tenant in the quiet enjoyment of her or his unit.

70.     On May 18, 2020, Ms. Long submitted a request via email to Mr. Alvarado for a copy of any and all incident reports concerning MPD and Ms. Long, as well as related MPD reports.  Mr. Alvarado did not respond.

71.     Around this time, Ms. Long also contacted Bread for the City to seek legal representation.  Shortly thereafter, Bread for the City agreed to represent Ms. Long and wrote a

---

2021) and https://www.dccourts.gov/sites/default/files/matters-docs/General%20Order%20pdf/General-Order-LT-July-28-2020_0.pdf (last accessed March 29, 2021).

demand letter to The Berkshire asking that property management staff: (1) stop opening Ms. Long's apartment for MPD to enter; (2) refrain from threatening adverse action based on the alleged noise of her young children; and (3) rescind the barring notice against Ms. Long's children's father, which was served on Ms. Long when MPD improperly entered her home with the assistance of Gables' concierge.  Bread for the City attempted, but was unable, to resolve the matter for Ms. Long.

72.    On May 19, 2020, Ms. Long's social worker Ms. Jackson asked to speak to Mr. Alvarado about Ms. Long's request for all incident reports involving MPD.  Mr. Alvarado responded by stating Ms. Long's attorney had contacted The Berkshire, and any subsequent communication would have to be made through The Berkshire's attorneys.  Mr. Alvarado also claimed that The Berkshire did not keep incident reports of any kind for incidents at the property that involved MPD, and Gables has since refused to provide Ms. Long and Ms. Jackson any information regarding alleged complaints or incidents.

  **E.**  **The Berkshire Staff Retaliates against Ms. Long and Furthers Her Hostile Housing Environment**

73.    After Ms. Long retained counsel at Bread for the City, The Berkshire staff retaliated against Ms. Long by refusing to communicate with her about day-to-day landlord/tenant issues in the same way they would communicate with other tenants.  The Berkshire's staff continued in its differential treatment of Ms. Long's routine requests until after her son, M.L., fell from the bedroom window in January 2021.  Only after that tragic event, which occurred after Gables' agents failed to secure the window as requested, have they been more responsive to Ms. Long.

74.    For example, in May 2020, property management at The Berkshire made it unnecessarily difficult for Ms. Long to obtain a parking pass for a car she had rented.  Specifically, Mr. Alvarado and the head concierge of The Berkshire told Ms. Long that she needed automobile

insurance, to which Ms. Long explained that she had purchased insurance from the rental company, which was reflected in the car rental contract. The Berkshire staff refused to issue her a parking pass and did not do so until Ms. Long had her attorney at Bread for the City contact Gables' counsel.

75.    In July 2020, Bread for the City referred Ms. Long to the Washington Lawyers' Committee for Civil Rights and Urban Affairs ("WLC"). After agreeing to represent Ms. Long, on July 23, 2020, the WLC sent a demand letter to Gables in an effort to initiate dialogue and address—and hopefully resolve—Ms. Long's claims. The WLC's attempts were also unsuccessful, as Gables vehemently denied Ms. Long's allegations and inaccurately claimed its prior discussions with Bread for the City had completely resolved Ms. Long's issues.

76.    Thereafter, Mr. Alvarado continued to retaliate against Ms. Long by requiring her, at certain times, to seek the assistance of her counsel to place non-emergency maintenance and other service requests. While The Berkshire did address occasional maintenance requests, it refused to address the majority of Ms. Long's requests.

77.    For example, during the last week of October 2020, Ms. Long called the leasing office to request that maintenance fix her bedroom closet door. She spoke to the concierge, who said he was going to put in a request on her behalf. Gables never repaired Ms. Long's door, suggesting that Gables either did not issue the request to maintenance staff or ignored the repair request altogether.

78.    On October 30, 2020, Ms. Long's bedroom closet door fell off of its tracking and landed on Ms. Long's newborn son, L.L. Immediately following the incident, her son had a growing knot on his head and was later taken to the hospital for medical evaluation. At the

hospital, L.L. was found to have some cognitive and sensory deficiencies.  He was unresponsive to sound, light, and touch because the door fell on his head.

79.    On another occasion, Ms. Long asked The Berkshire staff to replace the screen in her oldest son's bedroom window, but Gables never repaired the window screen.  Subsequently, on January 9, 2021, Ms. Long's three year-old son, M.L., tragically fell out of his window on the fourth floor.  M.L. suffered several broken bones on the left side of his body.  To date Gables has not secured the window.

80.    M.L. suffered from intense pain and sustained an infection in his arm due to his injuries.  He has also had to have several subsequent surgeries because of these injuries.  M.L.'s doctors have advised Ms. Long that her son will need to undergo physical and/or occupational therapy as a result of his injuries.

81.    Upon information and belief, Gables does not refuse to address other tenants' critical repairs for extended periods of time and/or does not require other tenants to communicate routine landlord/tenant issues to Gables' counsel through their own counsel.

**F.    Gables Has Refused to Meet its District of Columbia Landlord Obligations**

82.    In the District of Columbia, a landlord is prohibited from unreasonably interfering with a tenant's comfort, safety or enjoyment of the tenant's rental unit, or engaging in retaliatory action under D.C. Code § 42-3505.02, for the purpose of causing the housing accommodation to become vacant. D.C. Code § 42-3402.10(c)(1). This obligation includes a prohibition on "[f]requent visits or calls over the objection of the household." D.C. Code § 42-3402.10(c)(2)(b).

83.    Gables interfered with Ms. Long's enjoyment of her unit by: (1) failing to put an end to the neighbor's numerous 911 calls that disturbed Ms. Long at all hours of the day and night; (2) threatening to serve Ms. Long with a notice to vacate because Ms. Long's baby cried at night,

without investigating the veracity of her neighbor's claims that the infant unreasonably disturbed the neighbor for normal infant behavior; (3) ignoring Ms. Long's complaint that her neighbor had made racially charged remarks, which were likely the real reason for the harassment; and (4) opening Ms. Long's unit for MPD to enter and conduct a wellness check and serve a barring notice without Ms. Long's consent, a warrant, or other legitimate justification under the Lease or otherwise.

84.    Gables' failure to act and its affirmative harassing conduct of Ms. Long constitute violations of its D.C. statutory "covenant of quiet enjoyment" obligation.

**G.    Notice to Vacate**

85.    In November 2020, Ms. Long concluded that circumstances at The Berkshire were so bad that she could no longer continue living there.  On November 6, 2020, Ms. Long submitted a Notice to Vacate form stating that she would be moving out on December 17, 2020.  Thereafter she was unable to locate housing and informed Gables that she would remain in her unit until she was able to find other suitable housing for her and her three young children.

86.    In her Notice to Vacate, Ms. Long indicated that she felt forced to move because of the hostile housing environment she had been forced to endure at The Berkshire.

87.    When Ms. Long attempted to notify Gables that it would take her longer than expected to find other housing, Gables indicated that they wanted her to move, despite the fact that she had not found suitable replacement housing, and in the midst of a pandemic. Gables has continued to demand that Ms. Long and her family move out.

**H.    Harm Suffered By Ms. Long and Her Children, M.L. and L.L.**

88.    Because of the repeated harassment and hostile living environment to which she has been subjected at The Berkshire by Gables' agents, Ms. Long and her three young children

frequently stay overnight with family and friends and in hotels to avoid further hostility from Gables and/or her neighbors, as well as further intrusion by MPD, facilitated by Gables' agents. Being forced to stay the night away from their home has made it harder for the children to become acclimated to their home.

89.    When Ms. Long and her children do stay in their apartment at The Berkshire, they sleep in the same bedroom with the door locked, in the event The Berkshire staff again let MPD into the apartment without Ms. Long's consent and without a warrant.

90.    When the family stays at a hotel, Ms. Long is forced to pay for their stay out of pocket, even though she has a home for her family.  She is forced to pay for meals out for her and her children, despite having a kitchen in her apartment in which she could otherwise prepare meals. The hostile housing environment has forced Ms. Long and her family from their home, and deprived them of the quiet enjoyment and harassment-free use of their apartment, as well as the stability of what should be a permanent home.

91.    Ms. Long has suffered humiliation and severe emotional distress due to the hostile housing environment she has had to endure that has been enabled and directly furthered by Gables' agents, including at least two unauthorized entries into Ms. Long's unit by MPD, facilitated by The Berkshire's concierge.  Ms. Long has also had to increase the number of times she sees a therapist because of the trauma she has experienced as a result of Gables' conduct.

92.    Due to Gables' failure to repair the bedroom closet door in Ms. Long's apartment, which subsequently fell on Ms. Long's newborn, Plaintiff L.L., her infant has thus far suffered physical injuries and required medical treatment exceeding $150,000.  Ms. Long has been billed for the hospital fees, but the costs far exceed her ability to pay.

93.    Due to Gables' failure to repair and secure the window screen, which subsequently lead to Plaintiff M.L. falling from the fourth-story window, Plaintiff M.L. has suffered extensive physical injuries and required extensive medical treatment, including multiple surgeries.  These medical bills and hospital fees will similarly far exceed Ms. Long's ability to pay.

### COUNT I: DISCRIMINATORY TERMS, CONDITIONS, OR PRIVILEGES IN HOUSING
**(Familial status discrimination under the FHA, 42 U.S.C. § 3604(b))**
**(By Ms. Long, Individually and On Behalf of M.L. and L.L., Against Gables)**

94.    Plaintiffs re-allege and incorporate by reference paragraphs (1) through (93) of the Complaint herein.

95.    Section 804 of the FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, *familial status*, or national origin."  42 U.S.C. § 3604(b) (emphasis added).

96.    The United States Department of Housing and Urban Development's implementing regulation, 24 C.F.R. § 100.65, lists some of the prohibited actions that fall under 42 U.S.C. § 3604(b), including: "Subjecting a person to harassment because of *familial status* . . . that has the effect of imposing different terms, conditions, or privileges relating to the . . . rental of a dwelling or denying or limiting services or facilities in connection with the . . . rental of a dwelling."  24 C.F.R. §100.65(b)(7) (emphasis added).

97.    Ms. Long was subjected to harassment because of her familial status when Gables and its agents took no actions to curtail another resident – Ms. Long's neighbor – from making repeated 911 calls merely because Ms. Long's infant was crying at night.  These calls led to, among other things, Gables facilitating MPD's unwarranted entry into Ms. Long's unit.

98.     Because Gables permitted and facilitated MPD to enter Ms. Long's unit on several occasions without either a warrant or Ms. Long's consent, ostensibly to conduct wellness checks on her children, Ms. Long was precluded from maintaining a safe and comfortable dwelling that was free from harassment.

99.     Gables furthered the harassment of Ms. Long when its property manager, Mr. Alvarado, demanded that Ms. Long put her children to bed by 10 pm (ostensibly because he believed they would not then cry) and threatened her with a 30-day notice to quit for violating the building's "quiet hours" policy because her young children were crying.

100.    In violation of Section 804 of the FHA, Gables has unlawfully discriminated against Ms. Long through its unequal enforcement of a "noise" policy on the basis of familial status, specifically by purporting to require Ms. Long's children to refrain from crying from the hours of 10 pm to 6 am and, further, by permitting and facilitating MPD's warrantless entry into Ms. Long's unit unlawfully in response to the neighbor's noise complaints resulting from a baby crying *without* investigating the veracity of these complaints.

101.    Upon information and belief, if other tenants receive noise complaints, Gables does not permit or facilitate the entry of MPD into these tenants' units.  Nor, upon information and belief, does Gables threaten other tenants with eviction unless those other tenants refrain from making any noise from the hours of 10 pm to 6 am, let alone does Gables do so without providing written notice and the opportunity to cure the conduct at issue, particularly where, as here, the conduct at issue is, by its nature, *the uncontrollable, naturally occurring* conduct of infants crying.

102.    At all relevant times, when The Berkshire staff interacted with Ms. Long, they did so as agents of Gables and within the scope of their employment as The Berkshire property management staff.

103.    As a result of Defendant's discriminatory actions, Ms. Long has suffered emotional and physical distress and economic losses in an amount to be determined at trial.

104.    Gables' tolerance and/or facilitation of Ms. Long's neighbor's behavior against Ms. Long and its own harassing behavior demonstrate a willful and gross disregard for the known rights of Ms. Long.

### COUNT II: HOSTILE HOUSING ENVIRONMENT
### (Interference, Coercion, or Intimidation under the FHA,
### 42 U.S.C. § 3617, on the basis of race)
### (By Ms. Long, Individually and On Behalf of M.L. and L.L., Against Gables)

105.    Plaintiffs re-allege and incorporate by reference paragraphs (1) through (104) of the Complaint herein.

106.    Section 3617 of the FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his [or her] having exercised or enjoyed, or on account of his [or her] having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [S]ection 803, 804, 805, or 806 [42 USCS § 3603, 3604, 3605, or 3606]." 42 U.S.C. § 3617.

107.    Hostile environment harassment in the housing context refers to "unwelcome conduct that is sufficiently severe or pervasive as to interfere with . . . the use or enjoyment of a dwelling," based on a protected trait. 24 C.F.R. § 100.600 (a)(2).

108.    Under the U.S. Department of Housing and Urban Development's regulation governing direct and vicarious liability under the FHA, a person is directly liable for "[f]ailing to take prompt action to correct and end a discriminatory housing practice by that person's employee or agent, where the person knew or should have known of the discriminatory conduct" *and* for "[f]ailing to take prompt action to correct and end a discriminatory housing practice *by a third-party*, where the person *knew or should have known of the discriminatory conduct and had the*

*power to correct it*." 24 C.F.R. § 100.7 (a)(1)(ii)-(iii) (Emphasis added). Whether the entity has the power to take such remedial action and end such discriminatory treatment by the third party turns on "the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party." 24 C.F.R. § 100.7 (a)(1)(iii). Further, a party required to act to end a discriminatory housing practice may *not* include as any remedy any action that penalizes or harms the party affected by the discriminatory treatment, *including*, eviction. 24 C.F.R. § 100.7(a)(2).

109.   Here, Gables created a hostile housing environment in violation of the FHA, by failing to prevent unwelcome conduct by a neighboring resident at The Berkshire that was so severe and pervasive as to have interfered with Ms. Long's enjoyment of her apartment because of her race.

110.   Specifically, Gables enabled a hostile housing environment for Ms. Long and her children by refusing to investigate the veracity of her neighbor's noise complaints, despite the neighbor's complaints about Ms. Long's race to Gables' agents when she moved in, which Ms. Long reported to Gables. Gables knew the neighbor's actions may have been racially motivated, yet it took no steps to protect Ms. Long from this animus or the harassment arising from it. Gables further enabled and directly permitted a hostile housing environment for Ms. Long by repeatedly opening Ms. Long's apartment and facilitating MPD's entry, without abatement, that resulted from the neighbor's baseless calls to the police.

111.   Even though Gables knew of the harassment by the neighbor, and even though Gables had the power to correct the behavior because the neighbor's actions violated the "PROHIBITED CONDUCT" term of the Lease, it made no effort to address and put an end to the neighbor's harassing and unreasonable conduct.

112.    Gables is directly liable for the harassing behavior of Ms. Long's neighbor who has at all relevant times been subject to the terms of the Lease.  Gables is additionally liable for the actions of its agents who opened Ms. Long's home, resulting in warrantless entry by MPD, which arose from the neighbor's calls to the police without a legal basis or grounds under the Lease.  24 C.F.R. § 100.7 (a)(1)(ii)-(iii).

113.    At all relevant times, when Gables' staff at The Berkshire interacted with Ms. Long, they did so as agents of Gables and within the scope of their employment as The Berkshire property management staff.

114.    As a result of Defendant's discriminatory actions, Ms. Long has suffered emotional and physical distress and economic losses in an amount to be determined at trial.

115.    Gables' tolerance and/or facilitation of Ms. Long's hostile housing environment demonstrate a willful and gross disregard for the known rights of Ms. Long.

### COUNT III: HOSTILE HOUSING ENVIRONMENT
**(Interference, Coercion, or Intimidation under the FHA, 42 U.S.C. § 3617, on the basis of familial status)**
**(By Ms. Long, Individually and On Behalf of M.L. and L.L., Against Gables)**

116.    Plaintiffs re-allege and incorporate by reference paragraphs (1) through (115) of the Complaint herein.

117.    Section 3617 of the FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [S]ection 803, 804, 805, or 806 [42 USCS § 3603, 3604, 3605, or 3606]."  42 U.S.C. § 3617.

118.    Hostile environment harassment in the housing context refers to "unwelcome conduct that is sufficiently severe or pervasive as to interfere with . . . the use or enjoyment of a dwelling," based on a protected trait.  24 C.F.R. § 100.600 (a)(2).

119.    Under the U.S. Department of Housing and Urban Development's regulation governing direct and vicarious liability under the FHA, a person is directly liable for "[f]ailing to take prompt action to correct and end a discriminatory housing practice by that person's employee or agent, where the person knew or should have known of the discriminatory conduct" *and* for "[f]ailing to take prompt action to correct and end a discriminatory housing practice *by a third-party*, where the person *knew or should have known of the discriminatory conduct and had the power to correct it*."  24 C.F.R. § 100.7 (a)(1)(ii)-(iii) (Emphasis added).  Whether the entity has the power to take such remedial action and end such discriminatory treatment by the third party turns on "the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party."  24 C.F.R. § 100.7 (a)(1)(iii).  Further, actions taken to remedy discriminatory housing practices may *not* include as any remedy any actions that penalize or harm the party affected by the discriminatory treatment.  24 C.F.R. § 100.7(a)(2).

120.    Gables created a hostile housing environment in violation of the FHA by failing to prevent unwelcome conduct by a neighboring resident at The Berkshire that was so severe and pervasive as to have interfered with Ms. Long's enjoyment of her apartment on the basis of her familial status.

121.    Specifically, Gables enabled a hostile housing environment for Ms. Long and her children by refusing or failing to investigate the veracity of the neighbor's noise complaints about Ms. Long's young children, and taking no action to protect Ms. Long, or her children, from the neighbor's repeated, unwarranted, calls to the police.  Gables further enabled and directly

28

permitted a hostile housing environment for Ms. Long by facilitating multiple MPD visits to Ms. Long's apartment without abatement that resulted from the neighbor's baseless calls to the police regarding Ms. Long's children.

122.    Further, The Berkshire property manager, Mr. Alvarado, threatened Ms. Long with a 30-day notice to quit if she was unable to keep her young children from crying during The Berkshire's "quiet hours," even though, to the best of Ms. Long's knowledge, no such policy exists, and Mr. Alvarado further had reason to know that the children's crying was outside of Ms. Long's control.

123.    Even though Gables knew of the neighbor's harassment of Ms. Long, and even though Gables had the power to correct the behavior because the neighbor's actions violated the "PROHIBITED CONDUCT" term of the Lease, Gables made no effort to address and put an end to the neighbor's harassing and unreasonable conduct.

124.    Gables is directly liable for the harassing behavior of Ms. Long's neighbor who has at all relevant times been subject to the terms of the Lease.  Gables is additionally liable for the actions of its agents who facilitated MPD's entry into Ms. Long's home resulting from the neighbor's calls to the police without a legal basis or grounds under the Lease.  24 C.F.R. § 100.7 (a)(1)(ii)-(iii).

125.    At all relevant times when Gables staff at The Berkshire interacted with Ms. Long, they did so as agents of Gables and within the scope of their employment as The Berkshire property management staff.

126.    As a result of Defendant's discriminatory actions, Ms. Long has suffered emotional and physical distress and economic losses in an amount to be determined at trial.

127.    Gables' tolerance and/or facilitation of Ms. Long's hostile housing environment demonstrate a willful and gross disregard for the known rights of Ms. Long.

**COUNT IV: OTHERWISE MAKE A DWELLING UNAVAILABLE**
**(Harassment under the FHA, 42 U.S.C. § 3604(a),**
**on the basis of familial status and race)**
**(By Ms. Long, Individually and On Behalf of M.L. and L.L., Against Gables)**

128.    Plaintiffs re-allege and incorporate by reference paragraphs (1) through (127) of the Complaint herein.

129.    Section 804 of the FHA makes it unlawful "[t]to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a).

130.    The U.S. Department of Housing and Urban Development's implementing regulation, 24 C.F.R. §100.65, lists some of the prohibited actions that fall under 42 U.S.C. § 3604(b), including: "Subjecting a person to harassment because of race… [or] …familial status…that causes the person to vacate a dwelling[.]" 24 C.F.R. §100.60(b)(7).

131.    Ms. Long was subjected to harassment because of her familial status when Gables and its agents took no actions to prevent Ms. Long's neighbor from making repeated 911 calls resulting in harassment of Ms. Long and her children, merely because Ms. Long's infant was crying at night.  As a result of the neighbor's numerous calls to 911, Gables facilitated multiple baseless entries into Ms. Long's apartment by MPD without either a warrant or Ms. Long's consent.

132.    Gables' property manager, Mr. Alvarado, furthered the harassment by insisting Ms. Long's small children adhere to the building's "quiet hours" by not crying after 10 pm and threatening her with a 30-day notice to quit if Ms. Long could not curtail the crying.

30

133.    Ms. Long was further subjected to harassment because of her race when Gables refused to investigate the veracity of her neighbor's noise complaints, despite the neighbor's complaints about Ms. Long's race as soon as she moved in.  Gables knew of the neighbor's harassment of Ms. Long, had the power to correct the behavior, and made no effort to address and put an end to the neighbor's harassing and unreasonable conduct on the basis of Ms. Long's race.

134.    Because Gables failed to protect Ms. Long from unrelenting harassment by her neighbor, Ms. Long and her three small children will or may be forced to move out of their home.

135.    In violation of Section 804 of the FHA, Gables has unlawfully discriminated against Ms. Long by facilitating multiple unnecessary and warrantless MPD entries into Ms. Long's apartment without Ms. Long's consent.  Gables took no steps to protect Ms. Long from the neighbor's harassment, knowing that the harassment was because of Ms. Long's race.

136.    At all relevant times, when The Berkshire staff interacted with Ms. Long, they did so as agents of Gables and within the scope of their employment as The Berkshire property management staff.

137.    As a result of the Defendant's discriminatory actions, Ms. Long has suffered emotional and physical distress and economic losses in an amount to be determined at trial.

138.    Gables' tolerance and/or facilitation of the harassment of Ms. Long and her family by her neighbor demonstrates a willful and gross disregard for the known rights of Ms. Long.

## COUNT V: VIOLATION OF CIVIL RIGHTS ACT OF 1866
### (42 U.S.C. § 1981)
### (By Ms. Long Against Gables)

139.    Plaintiffs re-allege and incorporate by reference paragraphs (1) through (138) of the Complaint herein.

140.    42 U.S.C. § 1981 prohibits discrimination in the making and enforcement of contracts, and all the benefits of those agreements, where the discrimination is based on race.

31

141.    Ms. Long is African-American.  Her neighbor at The Berkshire began complaining about her race beginning the day after she moved in.  The neighbor continued from that day their harassment of Ms. Long, because of her race, which resulted in depriving Ms. Long of her enjoyment of the rights provided to her under the Lease.

142.    Gables and its agents at The Berkshire knew of the race-based complaints by a fellow tenant against Ms. Long.  Gables and its agents at The Berkshire took no steps to remedy the race-based harassment by Ms. Long's neighbor, or to otherwise ensure Ms. Long's enjoyment of the rights provided in her Lease.

143.    As a result of Gables' failure to stop the race-based harassment of Ms. Long and her family, Ms. Long has suffered emotional and physical distress and economic losses in an amount to be determined at trial.

### COUNT VI: UNLAWFUL RETALIATION
**(FHA, 42 U.S.C. § 3617)**
**(By Ms. Long, Individually and On Behalf of M.L. and L.L., Against Gables)**

144.    Plaintiffs re-allege and incorporate by reference paragraphs (1) through (143) of the Complaint herein.

145.    The FHA provides that it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [S]ection 803, 804, 805, or 806 [42 USCS § 3603, 3604, 3605, or 3606]."  42 U.S.C. § 3617.

146.    Further, 24 C.F.R. § 100.400(c)(5) prohibits retaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the FHA.

147.    Upon facing harassment by Gables' agents at The Berkshire and from her neighbor, Ms. Long sought legal counsel and took action to address and stop the harassment she endured, and continues to endure, because of her race and familial status, in violation of the FHA.

148.    Gables' agents became aware that Ms. Long had sought the assistance of counsel after receiving demand letters from Ms. Long's attorneys on May 18, 2020 and July 23, 2020, which demanded that Gables cease and desist from conduct that created a hostile housing environment for Ms. Long.

149.    After learning that Ms. Long sought to enforce her rights under the FHA, Gables staff retaliated against Ms. Long by refusing to fulfill maintenance and other ordinary tenant requests from Ms. Long, instead demanding that all maintenance and other requests be made through counsel.

150.    Even following Gables' request that maintenance and repair requests be made through legal counsel, Gables failed to timely make such repairs.  Gables' failure to make necessary repairs resulted in substantial injuries to two of Ms. Long's young children, Plaintiffs M.L. and L.L., and resulted in significant hospital and other expenses.

151.    This illegal conduct following Ms. Long's retention of counsel constitutes unlawful retaliation by Gables against Ms. Long, in violation of the FHA, 42 U.S.C. § 3617.

152.    As a result of Defendant's improper retaliation, Ms. Long has suffered emotional and physical distress and economic losses in an amount to be determined at trial.

153.    Gables' retaliation against Ms. Long for asserting her fair housing rights demonstrates a willful and gross disregard for the known rights of Ms. Long.

## COUNT VII: DISCRIMINATORY TERMS, CONDITIONS, OR PRIVILEGES IN HOUSING
### (Familial status discrimination under the DCHRA),
### D.C. Code § 2-1402.21(a)(2))
### (By Ms. Long, Individually and On Behalf of M.L. and L.L., Against Gables)

154.    Plaintiffs re-allege and incorporate by reference paragraphs (1) through (153) of the Complaint herein.

155.    Section 2-1402.21(a)(2) of the DCHRA makes it unlawful to "include in the terms or conditions of a transaction in real property, any clause, condition or restriction" based on familial status.

156.    Ms. Long was subjected to harassment because of her familial status when Gables and its agents took no steps to stop Ms. Long's neighbor from making repeated 911 calls merely because Ms. Long's children were crying at night.  These calls led to Gables enabling and facilitating MPD's warrantless entry into Ms. Long's unit without Ms. Long's consent.

157.    Gables furthered the harassment of Ms. Long when its property manager, Mr. Alvarado, threatened Ms. Long with a 30-day notice to quit for violating the building's purported "quiet hours" policy when her children cried.  Mr. Alvarado made these threats following conversations with Ms. Long after which he was or should have understood that the children's crying was entirely outside of Ms. Long's control.

158.    Upon information and belief, Gables did not apply or enforce a "quiet hours" policy against non-family households residing at The Berkshire.

159.    Because Gables permitted and enabled MPD's warrantless entry into Ms. Long's unit on several occasions, purportedly to conduct wellness checks on her children, Ms. Long was precluded from maintaining a safe and comfortable dwelling that was free from harassment.

160.    In violation of DCHRA section 2-1402.21(a)(2), Gables has unlawfully discriminated against Ms. Long through its unequal enforcement of the purported "quiet hours"

policy, specifically by deeming it a violation of such "policy" unless Ms. Long's children refrain from crying between the hours of 10 am and 6 pm, and by facilitating MPD's warrantless entry into Ms. Long's unit, unlawfully and without Ms. Long's consent, in response to her neighbor's noise complaints.

161.    Upon information and belief, when other, non-family tenants make noise at night, Gables does not facilitate MPD's entry to these tenants' units, nor does it threaten eviction without providing written notice and the opportunity to cure such noise-making conduct.  By depriving Ms. Long of such procedures and treating her differently merely because of her familial status— specifically, the fact that Ms. Long has young children—Gables' conduct has denied Ms. Long comfortable and harassment-free housing.

162.    At all relevant times, when The Berkshire staff interacted with Ms. Long, they did so as agents of Gables and within the scope of their employment as The Berkshire property management staff.

163.    As a result of Defendant's discriminatory actions, Ms. Long has suffered emotional and physical distress and economic losses in an amount to be determined at trial.

164.    Gables' tolerance and/or facilitation of Ms. Long's neighbor's behavior against Ms. Long, and its own harassing behavior, demonstrate a willful and gross disregard for the known rights of Ms. Long.

**COUNT VIII – HOSTILE HOUSING ENVIRONMENT ON THE BASIS OF RACE IN VIOLATION OF THE DCHRA**
**D.C. Code § 2-1402.61(a)**
**(By Ms. Long, Individually and On Behalf of M.L. and L.L., Against Gables)**

165.    Plaintiffs re-allege and incorporate by reference paragraphs (1) through (164) of the Complaint herein.

166.    Section 2-1402.61(a) of the DCHRA makes it unlawful to "interfere with any person in the exercise or enjoyment of . . . or on account of having aided or encouraged any other person in the exercise or enjoyment" of housing rights "granted or protected under this chapter." D.C. Code § 2-1402.61(a).  This includes the right to be free from discrimination based on "actual or perceived . . . race, . . . "  *Id.* § 2-1402.21(a).

167.    Gables created a hostile housing environment in violation of the DCHRA by failing to prevent unwelcome conduct by Ms. Long's neighbor at The Berkshire that was so severe and pervasive as to have interfered with Ms. Long's enjoyment of her apartment because of her race.

168.    Specifically, Gables enabled a hostile housing environment for Ms. Long by failing or refusing to investigate the veracity of her neighbor's noise complaints, and taking no steps to stop the neighbor from making repeated calls to the police that resulted in multiple MPD visits to Ms. Long's apartment, at which point Gables' staff facilitated and enabled MPD's warrantless entry to Ms. Long's apartment without Ms. Long's consent.  Gables let this harassment of Ms. Long continue without abatement.  At all times, Gables had the authority to address and put an end to the neighbor's harassing and unreasonable conduct.

169.    Gables furthered the hostile housing environment of Ms. Long, in violation of DCHRA, section 2-1402.61(a), by failing to take any steps to stop Ms. Long's neighbor from making repeated calls to 911 for noise complaints that resulted in Ms. Long's harassment, even though Gables had reason to know the neighbor was acting out of racial animus.  As of April 10, 2020 – the day after Ms. Long moved into The Berkshire, when her neighbor asked Gables staff why the building had "Black people living [t]here" – Gables knew or should have known the neighbor's actions were racially motivated.

170.    Gables additionally allowed and facilitated MPD's warrantless entry into Ms. Long's unit without her consent on two occasions (April 11, 2020 and April 24, 2020), amounting to severe, pervasive, and unwelcome conduct.

171.    These instances were followed by additional, unabated harassment by Ms. Long's neighbor.

172.    Such repeated, severe harassment, which was both perpetrated and facilitated by Gables, interfered with Ms. Long's exercise or enjoyment of her housing, in violation of the DCHRA.

173.    At all relevant times, when Gables' staff at The Berkshire interacted with Ms. Long, they did so as agents of Gables and within the scope of their employment as The Berkshire property management staff.

174.    As a result of Defendant's discriminatory actions, Ms. Long has suffered emotional and physical distress and economic losses in an amount to be determined at trial.

175.    Gables' tolerance and/or facilitation of the harassment of Ms. Long and her family by her neighbor demonstrates a willful and gross disregard for the known rights of Ms. Long.

## COUNT IX – HOSTILE HOUSING ENVIRONMENT ON THE BASIS OF FAMILIAL STATUS IN VIOLATION OF THE DCHRA,
### D.C. Code § 2-1402.61(a)
### (By Ms. Long, Individually and On Behalf of M.L. and L.L., Against Gables)

176.    Plaintiffs re-allege and incorporate by reference paragraphs (1) through (175) of the Complaint herein.

177.    Section 2-1402.61(a) of the DCHRA makes it unlawful to "interfere with any person in the exercise or enjoyment of . . . or on account of having aided or encouraged any other person in the exercise or enjoyment" of housing rights "granted or protected under this chapter."

D.C. Code § 2-1402.61(a).  This includes the right to be free from discrimination based on "actual or perceived . . . familial status, . . . "  *Id.* § 2- 1402.21(a).

178.    Gables created a hostile housing environment in violation of the DCHRA by failing to prevent unwelcome conduct by neighboring residents at The Berkshire that was so severe and pervasive as to have interfered with Ms. Long's enjoyment of her apartment on the basis of her familial status.

179.    Gables specifically enabled the hostile housing environment by refusing to investigate the veracity of the neighbor's noise complaints and by failing to take steps to stop the neighbor from making repeated calls to the police, which resulted in multiple MPD visits to Ms. Long's apartment without Ms. Long's consent, and without a warrant, over unverified noise complaints about her young children.

180.    At all times, Gables had the authority and obligation to address and put an end to the neighbor's harassing conduct.

181.    Gables also interfered with Ms. Long's enjoyment of her apartment at The Berkshire by participating in the creation of a hostile housing environment for Ms. Long because of her familial status, in violation of DCHRA, section 2-1402.61(a).

182.    Gables furthered the hostile housing environment on the basis of her familial status by permitting and facilitating MPD's warrantless entry into Ms. Long's unit without her consent in response to a neighbor's 911 calls about Ms. Long's baby crying.  This hostile housing environment was so severe and pervasive that it interfered with Ms. Long's ability to enjoy harassment-free housing.

183.    Specifically, during an incident on April 11, 2020, Gables knew that Ms. Long had two young children, one of which was a very young infant, and thus Gables knew Ms.

Long's children might well cry at night, and that a wellness check simply due to a young child crying was unnecessary.

184.    Further, The Berkshire property manager, Mr. Alvarado, threatened Ms. Long with a 30-day notice to quit if she was unable to keep her young children from crying during The Berkshire's "quiet hours," even though Mr. Alvarado knew, or should have known, that the children's crying was conduct that Ms. Long could not control.

185.    Such repeated, severe harassment, which was perpetrated and facilitated by Gables, interfered in Ms. Long's exercise or enjoyment of her housing, in violation of the DCHRA.

186.    At all relevant times when Gables staff at The Berkshire interacted with Ms. Long, they did so as agents of Gables and within the scope of their employment as The Berkshire property management staff.

187.    As a result of Defendant's discriminatory actions, Ms. Long has suffered emotional and physical distress and economic losses in an amount to be determined at trial.

188.    Gables' tolerance and/or facilitation of the harassment of Ms. Long and her family by her neighbor demonstrates a willful and gross disregard for the known rights of Ms. Long.

### COUNT X: UNLAWFUL RETALIATION IN VIOLATION OF DCHRA
**D.C. CODE § 2-1402.61(a)**
**(By Ms. Long, Individually and On Behalf of M.L. and L.L., Against Gables)**

189.    Plaintiffs re-allege and incorporate by reference paragraphs (1) through (188) of the Complaint herein.

190.    Under the DCHRA, it is an unlawful discriminatory practice to "retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter."  D.C. Code § 2-1402.61(a).

191.     Upon facing racial and familial status discrimination by Gables' employees at The Berkshire and from residents of The Berkshire, Ms. Long sought legal action to address and stop the harassment in violation of the DCHRA that she endured.

192.     Gables' employees at The Berkshire became aware that Ms. Long had sought the assistance of counsel after receiving demand letters from Ms. Long's attorneys on May 18, 2020 and July 23, 2020, which demanded that Gables cease and desist from conduct that created a hostile housing environment for Ms. Long.

193.     After learning that Ms. Long sought to enforce her rights under the DCHRA, Gables employees retaliated by refusing or otherwise failing to fulfill many maintenance and other ordinary tenant requests from Ms. Long, demanding that all maintenance and other requests instead be made through the respective parties' counsel.

194.     Even following Gables' request, and submitting maintenance and repair requests via legal counsel, Gables still failed to timely make such repairs.  Gables' failures resulted in, among other things, substantial injuries to two of Ms. Long's young children, Plaintiffs M.L. and L.L., resulting in significant hospital and other related expenses.

195.     As a result of its illegal conduct following Ms. Long's retention of counsel, Defendant Gables engaged in unlawful retaliation against Ms. Long in violation of the DCHRA, D.C. Code § 2-1402.61(a).

196.     As a result of Defendant's retaliatory conduct, Ms. Long has suffered emotional and physical distress and economic losses in an amount to be determined at trial.

197.     Gables' retaliation against Ms. Long for asserting her fair housing rights demonstrates a willful and gross disregard for the known rights of Ms. Long.

## COUNT XI: BREACH OF CONTRACT
### (By Ms. Long Against Gables)

198.    Ms. Long re-alleges and incorporates by reference paragraphs (1) through (197) of the Complaint herein.

199.    On April 9, 2020, Gables, through its agents at The Berkshire, signed a contract with Ms. Long, pursuant to which Gables leased Unit 4015 at The Berkshire to Ms. Long for a period of 12 months.  *See* Ex. A hereto, Lease.

200.    The Lease states, in pertinent part:

**23.    WHEN WE MAY ENTER.**

A. *Except in the event of an emergency* for the protection or preservation of the Apartment, or *for the protection and safety of the tenants or other persons*, the *Landlord may enter the Apartment during the Tenant's tenancy only for a reasonable purpose, at a reasonable time, and after having provided the Tenant with reasonable notice*.

B. "Reasonable notice" means written notice provided to the Tenant *at least 48 hours before the time the Landlord wishes to enter the Apartment or a shorter period of time as agreed to by the Tenant in writing*. Written notice may include electronic communication including email and mobile text messaging, provided that if the Tenant fails to furnish a written acknowledgment, the Landlord will provide a paper notice.

C. "Reasonable time" means a time *between the hours of 9 a.m. and 5 p.m.*, and not on a Sunday or federal holiday, or at another time agreed upon by the Tenant.

D. "Reasonable purpose" means a purpose that is directly related to the Landlord's duty to keep the Apartment Community safe from damage, to inspect the Apartment, make necessary or agreed repairs, decorations, alteration, renovations or improvements, supply necessary or agreed services, maintenance, or exhibit the Apartment to prospective or actual purchasers, mortgagees, tenants, workmen or contractors or to gain entry for work ordered by a governmental agency.

[…]

*You hereby expressly permit our access to your Apartment by the owner, management, or by its/their agent(s) in circumstances which may include, but are not limited to the following*: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke detector

41

batteries; retrieving unreturned tools, equipment or appliances; preventing waste of utilities; exercising our contractual lien; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or security devices; removing or re-keying unauthorized locks or security devices; removing unauthorized window coverings; *stopping excessive noise*; removing health or safety hazards (including hazardous materials), or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected and you fail to remove them; retrieving property owned or leased by former tenants; *inspecting when immediate danger to person or property is reasonably suspected*; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); *allowing entry by a law enforcement officer with a search or arrest warrant, or in hot pursuit*; showing apartment to prospective tenants (after move-out or vacate notice has been given); or showing apartment to government inspectors, fire marshals, lenders, appraisers, contractors, prospective buyers, or insurance agents.

(Emphasis added).

201.    On or about April 11, 2020 at approximately 2:30 a.m., Gables accessed Ms. Long's apartment, even though no emergency justified such access, even though such access was not obtained for the protection and safety of Ms. Long, her children, or others, and even though such access was not completed at a "reasonable time" or with "reasonable notice" to Ms. Long, as required by the terms of the Lease.

202.    Additionally, Gables' access into Ms. Long's apartment on April 11, 2020 at 2:30 a.m. was not for the purpose of "stopping excessive noise" and was not to allow entry by law enforcement *with a search or arrest warrant, or in hot pursuit*.

203.    Accordingly, Gables breached Section 23 of the Lease on or about April 11, 2020, when it accessed Ms. Long's apartment to allow for MPD's entry at 2:30 a.m.

204.    Gables again breached this provision of the Lease on April 24, 2020, by accessing Ms. Long's apartment to allow for MPD's entry to serve a purported barring notice on Mr. Suber.

205.    Specifically, on April 24, Gables accessed Ms. Long's apartment, even though no emergency justified such access, even though such access was not obtained for the protection and safety of Ms. Long, her children, or others, and even though such access was not completed at a "reasonable time" or with "reasonable notice" to Ms. Long, as required by the terms of the Lease.

206.    Further, Gables' access into Ms. Long's apartment on April 24, 2020 was not to allow entry by law enforcement *with a search or arrest warrant, or in hot pursuit*.

207.    Accordingly, Gables breached Section 23 of the Lease on or about April 24, 2020, when it accessed Ms. Long's apartment to have MPD enter and serve a purported barring notice.

208.    Additionally, the Lease states, in pertinent part:

**26.    RESPONSIBILITIES OF OWNER.** We will comply with the Housing Regulation requirements to:

(1) keep common areas reasonably clean and maintained;

(2) *maintain fixtures, furniture*, hot water, heating and A/C equipment which we have installed and own; and

(3) *make all reasonable requested repairs* required by this Lease Contract, subject to your obligation to pay for damages for which you are liable.

Owner is not responsible, as a matter of law in the District of Columbia, to make any repair(s) that it has not been informed of.

(Emphasis added).

209.    Gables breached Section 26 of the Lease by, among other things, failing to maintain Ms. Long's bedroom closet door despite repeated requests for maintenance, which ultimately led to the closet door falling off its tracking on October 30, 2020 and injuring Ms. Long's newborn son, Plaintiff L.L.

210.    Immediately following this October 30, 2020 incident, Ms. Long's son, L.L., had a growing knot on his head and was later taken to the hospital for medical evaluation. At the

hospital, her son was found to have some cognitive and sensory deficiencies.  He was unresponsive to sound, light, and touch.

211.    Gables also breached Section 26 of the Lease by, among other things, failing to replace a window screen in the bedroom of Ms. Long's son, Plaintiff M.L., despite Ms. Long having requested that The Berkshire staff do so.  This ultimately led to M.L. falling out of his fourth floor window on January 9, 2021.  M.L. suffered several broken bones and a lacerated liver, among other injuries, on the left side of his body as a result of the fall.

212.    Ms. Long has incurred substantial out-of-pocket medical and other expenses as a result of these and other breaches of the Lease by Gables.

213.    As a result of Gables' breaches of the Lease, Ms. Long has been damaged in an amount to be determined at trial.

## COUNT XII: NEGLIGENCE
### (By Ms. Long, Individually and On Behalf of M.L. and L.L., Against Gables)

214.    Plaintiffs re-allege and incorporate by reference paragraphs (1) through (213) of the Complaint herein.

215.    At all times relevant to this Complaint, Gables, as property manager of The Berkshire, has been Ms. Long's landlord.  Ms. Long's children, including M.L. and L.L., also reside in the apartment rented by Ms. Long.

216.    As a landlord, Gables owes a duty of care to Ms. Long and her children, its tenants.  Gables' duty of care includes a duty to repair and provide continued maintenance to the rented apartment throughout the term of the Lease.

217.    Gables breached its duty to repair and provide continued maintenance of Ms. Long's apartment by failing to repair the bedroom closet door, despite repeated requests by Ms. Long for this repair.

218.    As a result of this failure to maintain and repair the closet door, it fell off its tracking on October 30, 2020 and injured Ms. Long's newborn son, Plaintiff L.L.

219.    Immediately following the October 30, 2020 incident, L.L. had a growing knot on his head and was later taken to the hospital for medical evaluation.  At the hospital, he was found to have some cognitive and sensory deficiencies and was unresponsive to sound, light, and touch.

220.    Gables' failure to maintain and repair the closet door directly caused these injuries to L.L.

221.    Gables also breached its duty to repair and provide continued maintenance of Ms. Long's apartment by failing to replace and secure the window screen in the bedroom of Ms. Long's son, Plaintiff M.L., despite Ms. Long's request that The Berkshire staff do so.

222.    As a result of this failure to maintain and repair the window screen, M.L. fell out of his fourth floor window on January 9, 2021.

223.    M.L. suffered several broken bones and a lacerated liver on the left side of his body as a result of the fall from the window.

224.    Gables' failure to maintain and repair the window screen directly caused these injuries to M.L.

225.    Ms. Long has incurred substantial out-of-pocket medical expenses and other expenses due to these injuries to L.L. and M.L., which were a result of Gables' breach of its duty of care to Ms. Long and her children and its specific failure to maintain and repair the unit.

226.    As a result of Gables' negligence, Ms. Long's children L.L. and M.L. have been damaged in an amount to be determined at trial.

## COUNT XIII – TRESPASS
### (By Ms. Long Against Gables)

227.    Ms. Long re-alleges and incorporates by reference paragraphs (1) through (226) of the Complaint herein.

228.    On April 11, 2020 at 2:30 am, Gables trespassed on the property of Ms. Long.

229.    Without Ms. Long's permission, Gables intentionally granted MPD unauthorized entry into Ms. Long's apartment, which interfered with her possessory interest therein and her right to exclude others.

230.    Again on April 24, 2020, Gables intentionally granted MPD unauthorized entry into Ms. Long's property despite Ms. Long's explicit refusal to the entry.

231.    This unauthorized entry into Ms. Long's apartment also interfered with her possessory interest therein and her right to exclude others.

232.    As a result of Defendant's conduct, Ms. Long has suffered emotional and physical distress and economic losses in an amount to be determined at trial.

## PRAYER FOR RELIEF

A.    Compensatory damages for the physical injuries suffered by Ms. Long's two minor children, including, but not limited to, actual medical costs, and anticipated costs for their physical and/or occupational therapy.

B.    Compensatory damages for the pain and suffering Ms. Long's children have suffered as a result of their physical injuries.

C.    Compensatory damages for the actual damages Ms. Long has suffered as a result of a hostile housing environment, including, but not limited to, reimbursement for costs arising from her inability to stay safely, without harassment, in her home.

D.    Compensatory and punitive damages for the discriminatory housing environment enabled and facilitated by Gables and its agents.

E.    Compensatory and punitive damages for the hostile housing environment enabled and facilitated by Gables and its agents.

F.    Compensatory and punitive damages for the unlawful retaliation against Ms. Long by Gables and its agents.

G.    Compensatory and punitive damage for the discriminatory terms, conditions, and/or privileges of housing that Gables and its agents imposed on Ms. Long, based on her familial status.

H.    Reasonable attorney's fees.

I.    Costs of litigation.

J.    Such other relief as the Court deems appropriate.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.


Dated: March 31, 2021

                            Respectfully submitted,


                             /s/ Catherine Cone_____
                            Catherine Cone (D.C. Bar No. 1032267)
                            (catherine_cone@washlaw.org)
                            Brook Hill (D.C. Bar No. 1044120)
                            (brook_hill@washlaw.org)
                            **Washington Lawyers' Committee for Civil Rights and Urban Affairs**
                            700 14th Street, NW, Suite 400
                            Washington, DC  20005
                            Telephone:  202-319-1000
                            Fax:  202-319-1010

47

Brian D. Koosed (D.C. Bar No. 1034733)
Amy J. Eldridge (D.C. Bar No. 1000291)
**K&L Gates LLP**
1601 K Street NW
Washington, D.C. 20006
Tel:    202-778-9000
Fax:    202-778-9100
E-mail: brian.koosed@klgates.com
        amy.eldridge@klgates.com

*Counsel for Plaintiffs*