**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Dasha Long, M.L., and L.L.,** ) | |
| ) | |
| *Plaintiffs* ) | |
| ) | |
| v. ) | **Case No.  1:21-cv-00881 (ACR)** |
| ) | |
| **Gables Residential Services, Inc.** ) | |
| ) | |
| and ) | |
| ) | |
| **Berkshires Apartments, LLC** ) | |
| ) | |
| *Defendants.* ) | |

**PLAINTIFFS' OPPOSITION TO
DEFENDANT GABLES RESIDENTIAL SERVICES, INC.'S MOTION TO DISMISS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ....................................................................................................3

ARGUMENT ........................................................................................................9

   I.   PLAINTIFFS' COMPLAINT PLAUSIBLY ALLEGES CLAIMS FOR HOSTILE
HOUSING ENVIRONMENT BASED ON RACE AND FAMILIAL STATUS............10

        A.  The Court Can Rely on Recent Implementing Regulations
to Assess the Sufficiency of Plaintiffs' Hostile Housing
Environment Claims ..................................................................................10

        B.  Discriminatory Intent is Not Required to Adequately Plead
a Hostile Housing Environment Claim .................................................12

        C.  Ms. Long's Well-Pled Allegations State a Claim for Hostile
Housing Environment Discrimination ....................................................15

               1.  Gables knew or should have known about the harassment
of Ms. Long and her young children and failed to take
action to correct it ..................................................................................19

               2.  The Lease provides additional reasons why Defendants'
conduct is actionable under the 2016 Hostile Housing
Environment Regulations.......................................................................21

   II.   PLAINTIFFS' COMPLAINT ALLEGED SUFFICIENT FACTS TO SUPPORT A
RETALIATION CLAIM AGAINST GABLES ................................................23

  III.   PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT GABLES
DISCRIMINATED OR OTHERWISE MADE HOUSING UNAVAILABLE ON
THE BASIS OF FAMILIAL STATUS AND/OR RACE .................................25

  IV.   PLAINTIFFS HAVE STATED A CLAIM UNDER 42 U.S.C. § 1981 BY
ALLEGING THAT GABLES KNEW THEIR NEIGHBOR HARBORED
RACIAL ANIMUS AND FAILED TO INVESTIGATE AND/OR TAKE
ACTION BASED ON MS. LONG'S COMPLAINT ABOUT RACIAL
HARASSMENT ......................................................................................29

   V.   PLAINTIFFS HAVE STATED A NEGLIGENCE CLAIM UNDER D.C. LAW ..........31

        A.  Plaintiffs Allege Multiple Sources of Gables' Duties to
Maintain and Repair the Long's Residence ..........................................32

B. Gables' Arguments Present Only Questions of Fact, and the Court Should Deny the Motion to Dismiss on These Grounds ........................................................................................... 36

    1. Gables' causal challenge to the claim for injury to L.L. from the closet door presents questions of fact ...................................... 36

    2. Gables' causal challenge to the claim for injury to M.L. from the unrepaired window screen presents questions of fact ........................................................................................... 38

VI.   THE COMPLAINT PLEADS A COGNIZABLE BREACH OF CONTRACT CLAIM ........................................................................... 40

VII.  THE COMPLAINT PLEADS A COGNIZABLE CLAIM FOR TRESPASS ............................................................................................. 42

LEAVE TO AMEND .................................................................................... 45

CONCLUSION ............................................................................................. 45

# TABLE OF AUTHORITIES

**CASES**

*Alamo v. Bliss,*
 864 F.3d 541 (7th Cir. 2017) ...........................................................................13

*Alexander v. Riga,*
 208 F.3d 419 (3d Cir. 2000)..............................................................................26

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009).................................................................................. *passim*

*Associated Gas Distribs. v. FERC,*
 899 F.2d 1250 (D.C. Cir. 1990)........................................................................27

*Atchinson v. District of Columbia,*
 73 F.3d 418 (D.C. Cir. 1996) ..............................................................................9

*Attias v. CareFirst, Inc.,*
 No. 15-CV-00882 (CRC), 2021 WL 311000 (D.D.C. Jan. 29, 2021) ..............40

*\*Ayissi-Etoh v. Fannie Mae,*
 712 F.3d 572 (D.C. Cir. 2013)..........................................................................29

*\*Banks v. B.F. Saul Company,*
 212 A.2d 537 (D.C. 1965) ...............................................................35, 36, 37

*Bell Atlantic Corp. v. Twombly,*
 550 U.S. 544 (2007)................................................................................9, 37, 30, 34

*Brown v. Sessoms,*
 774 F.3d 1016 (D.C. Cir. 2014) ........................................................................40

*Bryant v. City of Norfolk,*
 Civil Action No. 2:20CV26 (RCY), 2021 WL 765405 (E.D. Va. Feb. 26, 2021) ............25

*Byrne v. Boardle,*
 2 Hurl. & Colt. 722, 159 Eng. Rep. 299 (1893)................................................37

*Carnegie-Mellon Univ. v. Cohill,*
 484 U.S. 343 (1988)..............................................................................................9

*Charles v. Home Depot, U.S.A., Inc.,*
 No. 16-CV-2054 (EGS), 2019 WL 95563 (D.D.C. Jan. 3, 2019)...............32, 34

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ........................................................................................ 10-11

*Clark Cty. Sch. Dist. v. Breeden*,
    532 U.S. 268 (2001) ............................................................................................ 24

*\*Clarke v. O'Connor*,
    435 F.2d 104 (D.C. 1970) ................................................................................... 35

*Council on Am.–Islamic Relations Action Network, Inc. v. Gaubatz*,
    793 F. Supp. 2d 311 (D.D.C. 2011) ................................................................... 44

*Cruz v. Coach Stores, Inc.*,
    202 F.3d 560 (2d Cir. 2000) ............................................................................... 23

*\*Cudjoe v. Watermark Villas at Quail N., LLC*,
    Case No. CIV-17-1068-D, 2019 WL 1212932 (W.D. Okla. Mar. 14, 2019) ............. 11, 20

*D.C. Transit Sys., Inc. v. Harris*,
    284 A.2d 277 (D.C. 1971) ................................................................................. 32

*Democracy Partners v. Project Veritas Action Fund*,
    285 F. Supp. 3d 109 (D.D.C. 2018) ................................................................... 44

*Dyson v. Dutko Ragen Homes & Invs.*,
    No. 21-CV-02280, 2022 WL 1294484 (D.D.C. Apr. 27, 2022) .......................... 17, 18, 21

*DiCenso v. Cisneros*,
    96 F.3d 1004 (7th Cir. 1996) ............................................................................. 13

*Dickens v. D.C.*,
    Civil Action No. 05-355 (EGS), 2007 WL 495801 (D.D.C. Feb. 12, 2007) .......... 9, 22, 28

*\*District of Columbia v. Cooper*,
    445 A.2d 652 (D.C. 1982) ................................................................................. 32, 34, 40

*Dowe v. Total Action Against Poverty in Roanoke Valley*,
    145 F.3d 653 (4th Cir. 1998) ............................................................................. 24

*Dunn v. Wash. Cty. Hosp.*,
    429 F.3d 689 (7th Cir. 2005) ............................................................................. 14

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ............................................................................................. 9

*Frisby v. Schultz*,
    487 U.S. 474 (1988)..................................................................................................19

*Flynn v. Dick Corp.*,
    481 F.3d 824 (D.C. Cir. 2007) ..................................................................................44

*Francis v. Kings Park Manor*,
    992 F.3d 67 (2d Cir. 2021)..................................................................................14, 29

*Francis v. Rehman*,
    110 A.3d 615 (D.C. 2015) ........................................................................................40

*Garay v. Liriano*,
    943 F. Supp. 2d 1 (D.D.C. 2013) ..............................................................................42

*George Washington University v. Weintraub*
    458 A.2d 43 (D.C. 1983) ..........................................................................................35

*Gill v. Mayor of District of Columbia*,
    Civil Action No. 07-64 (EGS), 2007 WL 1549100 (D.D.C. May 25, 2007)...................29

*Gilligan v. Jamco Dev. Corp.*,
    108 F.3d 246 (9th Cir. 1997) ....................................................................................14

*Girdler v. United States*,
    923 F. Supp. 2d 168 (D.D.C. 2013) ..........................................................................32

*\*Gould v. DeBeve*,
    330 F.2d 826 (D.C. 1964) ...................................................................................38, 39

*Gregorio v. Hoover*,
    238 F. Supp. 3d 37 (D.D.C. 2017) ............................................................................40

*Hailey v. Otis Elevator Co.*,
    636 A.2d 426 (D.C. 1994) ........................................................................................37

*\*Hall v. Greystar Mgmt. Servs., L.P.*,
    637 F. App'x 93 (4th Cir. 2016) ................................................................................23

*Harris v. Vanderburg*,
    584 F. Supp. 3d 82, 94 (E.D.N.C. 2022) ...................................................................21

*Havens Realty v. Coleman*,
    455 U.S. 363 (1982)..................................................................................................26

*Honce v. Vigil*,
    1 F.3d 1085 (10th Cir. 1993) ...........................................................................13

*Jimenez v. David Y Tsai*,
    Case No. 5:16-cv-04434-EJD, 2017 WL 2423186 (N.D. Cal. June 5, 2017)............. 28-29

*Kanelos v. Kettler*,
    406 F.2d 951 (D.C. 1968) ...............................................................................35

*King v. Rumsfeld*,
    328 F.3d 145 (4th Cir. 2003) ...........................................................................23

*Lynn v. District of Columbia*,
    734 A.2d 168 (D.C. 1999) ...............................................................................32

*Martinez v. Optimus Props., LLC*,
    Case No. 2:17-cv-03581-SVW-MRW, 2018 WL 6039875 (C.D. Cal. June 6, 2018) ......27

*Miller v. Bd. of Managers of Whispering Pines at Colonial Woods Condo. II*,
    457 F. Supp. 2d 126 (E.D.N.Y. 2006) ...............................................................23

*Monus v. Riecke*,
    CIVIL ACTION NO. 21-218, 2021 WL 1721010 (E.D. La. Apr. 30, 2021) ...................15

*Morgan v. Barry*,
    12 Fed. App'x. 1 (D.C. Cir. 2000) ....................................................................42

*Myers v. District of Columbia Hous. Auth.*,
    No. 10-CV-700, 2022 WL 3715795, at *5-6 (D.D.C. Aug. 29, 2022) .............................11

*\*Nanko Shipping, USA v. Alcoa, Inc.*,
    850 F.3d 461 (D.C. Cir. 2017) ....................................................................30, 31

*Nat'l Fair Hous. All. v. Prudential Ins. Co. of Am.*,
    208 F. Supp. 2d 46 (D.D.C. 2002) ...................................................................27

*Ndondji v. Interpark, Inc.*,
    768 F. Supp. 2d 263 (D.D.C. 2011) ..................................................................30

*Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*,
    950 F. Supp. 393 (D.D.C. 1996) ......................................................................10

*Pessagno v. Euclid Inv. Co.*,
    112 F.2d 577 (D.C. 1940) ...............................................................................32

vii

*Powell v. District of Columbia*,
    602 A.2d 1123 (D.C. 1992) ........................................................................32

*Price v. Thompson*,
    380 F.3d 209 (4th Cir. 2004) ...................................................................24

*Reeves v. Carrollsburg Condo. Unit Owners Ass'n*,
    No. CIV. A. 96-2495RMU, 1997 WL 1877201 (D.D.C. Dec. 18, 1997)........26

*Revcock v. Cowpet Bay W. Condo. Assn'n*,
    853 F.3d 96 (3d Cir. 2017)..................................................................19, 25

*\*Ring v. First Interstate Mortg., Inc.*,
    984 F.2d 924 (8th Cir. 1993) ...................................................................14

*Robinson v. Farley*,
    264 F. Supp. 3d 154 (D.D.C. 2017)..........................................................42

*Scutt v. Dorris*,
    CIV. NO. 20-00333 JMS-WRP, 2021 WL 206356 (D. Haw. Jan 20, 2021)....26

*Speights v. 800 Water Street, Inc.*,
    4 A.3d 471 (D.C. 2010) ..........................................................................37

*Stevens v. Willis*,
    175 A.2d 600 (D.C. 1961) .......................................................................39

*Swierkiewicz v. Sorema*,
    534 U.S. 506 (2002)...............................................................................29

*Trafficante v. Metro. Life Ins. Co.*,
    409 U.S. 205 (1972)...............................................................................26

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966).................................................................................9

*United States v. Plaza Mobile Ests.*,
    273 F. Supp. 2d 1084 (C.D. Cal. 2003) ....................................................29

*Wall v. Reliance Standard Life Ins. Co.*,
    Civ. Action No. 20-2075 (EGS), 2021 WL 2209405 (D.D.C. June 1, 2021)....31

*Warren v. District of Columbia*,
    353 F.3d 36 (D.C. Cir. 2004) ...........................................................9, 22, 28

*West v. DJ Mortg. LLC,
    271 F. Supp. 3d 1336 (N.D. Ga. 2017) ...............................................12, 15, 20

*Wetzel v. Glen St. Andrew Living Cmty., LLC,
    901 F.3d 856 (7th Cir. 2018) ................................................................. passim

Wharf, Inc. v. D.C.,
    133 F. Supp. 3d 29 (D.D.C. 2015) .......................................................................44

Whitbeck v. Vital Signs, Inc.,
    116 F.3d 588 (D.C. Cir. 1997) ...........................................................................10

Williams v. Cerberonics, Inc.,
    871 F.2d 452, 457 (4th Cir. 1989) .....................................................................23

Woodard v. Fanboy, L.L.C.,
    298 F.3d 1261 (11th Cir. 2002) .........................................................................29

*Wright v. Allen,
    60 A.3d 749 (D.C. 2013) ..............................................................................41, 42

*Youssef v. 3636 Corp.,
    777 A.2d 787 (D.C. 2001) .............................................................................32, 34

## STATUTES

28 U.S.C. § 1367 ......................................................................................................9, 10

42 U.S.C. § 1981 ..................................................................................................... passim

42 U.S.C. § 3535(d) ...................................................................................................10

42 U.S.C. § 3604(a) ............................................................................................... passim

42 U.S.C. § 3604(b) ............................................................................................... passim

42 U.S.C. § 3608(a) ...................................................................................................10

42 U.S.C. § 3617 ................................................................................................... passim

D.C. Code § 2-1402.21(a)(2) ....................................................................................26

D.C. Code § 2-1402.61(a) ........................................................................................10

## REGULATIONS

24 C.F.R. § 100.60(b)(7) ................................................................26, 27

24 C.F.R. § 100.65(b)(7) ................................................................26, 28

24 C.F.R. § 100.400(c)(5) ..................................................................2, 23

24 C.F.R. § 100.600 ................................................................11, 13, 15, 21

24 C.F.R. § 100.600(a) ................................................................1, 11, 12

24 C.F.R. § 100.600(b) ..........................................................................12

24 C.F.R. § 100.600(c) ..........................................................................12

24 C.F.R. § 100.7 ............................................................................ *passim*

24 C.F.R. § 100.7(a) ................................................................................11, 21

14 DCMR § 700.1 ..................................................................................36

## OTHER

Fed. R. Civ. P. 8(a)(2) ............................................................................9

Fed. R. Civ. P. 12(b)(6) ................................................................4, 37, 40

*81 Fed. Reg. Vol. 178, 63054 (Sept. 14, 2016) ................................ *passim*

Plaintiffs Dasha Long ("Ms. Long") and her minor children, M.L. and L.L. (collectively, "Plaintiffs" or "Long family") respectfully submit this opposition ("Opposition" or "Opp.") to the Motion to Dismiss (ECF No. 40) filed by defendant Gables Residential Services, Inc. ("Gables" or "Defendant Gables").

**PRELIMINARY STATEMENT**[1]

This case arises from the hostile housing environment Plaintiffs endured at their home in the Berkshires Apartments ("The Berkshire").  The conditions giving rise to Plaintiffs' claims began the day they moved in, were exacerbated by Defendants' failure to take any action to remedy the hostile housing environment, and were compounded by additional, subsequent retaliation against Plaintiffs.  The Complaint further alleges that Defendants failed to make requested repairs in the Long family's apartment, which resulted in substantial injuries to the minor plaintiffs, L.L. and M.L.  Gables seeks dismissal of Plaintiffs' claims under Fed. R. Civ. P. 12(b)(6), but for the reasons that follow, the Court should deny Gables' motion.

1.      **Plaintiffs plausibly allege hostile housing environment claims arising from racial and familial status discrimination.**  The Fair Housing Act ("FHA") prohibits actions that impede an individual in the exercise or enjoyment of her residence on the basis of any rights granted or protected by the FHA.  42 U.S.C. § 3617.  To enforce the FHA, the U.S. Department of Housing and Urban Development ("HUD") promulgated regulations in 2016, which explicitly created liability for hostile housing environments, *including* liability for failing to correct such an environment, even if created by a third-party.  24 C.F.R. §§ 100.600(a), 100.7.  Here, Plaintiffs have alleged Gables failed to address the hostile housing environment the Long family endured,

---

[1]      All citations to the complaint ("Complaint" or "Compl."), are to the operative complaint, ECF No. 13. Citations to Defendant Gables' Memorandum in Support of its Motion to Dismiss are to the "Memorandum" or "Mem."

despite Gables' knowledge of the behavior and underlying racial animus of Ms. Long's neighbor, and further facilitated harassment of the family.  Plaintiffs have thus adequately pled a hostile housing environment claim.

2.     **When Ms. Long tried to remedy the discrimination she was facing, Gables took retaliatory action in violation of the FHA.**  Almost immediately after Ms. Long's counsel made themselves known to Gables, Gables subjected Ms. Long to additional discriminatory treatment, including for day-to-day repairs to the Long family's unit.  Compl. ¶¶ 72-74.  Gables then failed to make those repairs causing, in two instances, substantial injuries to the minor Plaintiffs.  This is sufficient to state a retaliation claim.  *See* 42 U.S.C. § 3617; 24 C.F.R. § 100.400(c)(5).

3.     **Gables, through its actions and failure to act, also made housing unavailable and discriminated in the terms or conditions of housing because of the Long family's race and familial status, in violation of 42 U.S.C. §§ 3604(a) and (b).**  The FHA prohibits differential treatment of individuals on the basis of race or familial status, including conduct that makes housing unavailable or that subjects an individual to different terms and conditions on the basis of a protected characteristic.  Here, Gables' discriminatory actions, and facilitation of the neighbor's harassment of the Long family, caused Plaintiffs to leave their apartment and sleep elsewhere some nights.  Additionally, Gables subjected Plaintiffs to a supposed "quiet hours" policy as a means of requiring Ms. Long's baby to stop crying when such a policy was neither in the lease nor apparently equally enforced against other Berkshire tenants.  This conduct is actionable under federal law.

4.     **Plaintiffs' well-pled facts establish that Gables violated Section 1981 of the Civil Rights Act by discriminating on the basis of race in enforcing Ms. Long's lease.**  Gables knew of Ms. Long's race, and that she was being subjected to treatment informed by racial animus (Compl. ¶ 33), yet Gables did not remedy this.  Instead, it threatened her with a notice to vacate if

she could not get her infant to quit crying at night.  This conduct, coupled with Gables' knowing indifference to the treatment of Ms. Long, suffices to state a Section 1981 claim.

5.     **Gables failed to fix a closet door and to secure a window screen when requested, causing injuries to the two minor Plaintiffs.**  First, Ms. Long asked that Gables repair a closet door.  They did not, and it fell on her infant son, L.L., who was less than two weeks old at the time.  Second, Ms. Long asked that Gables repair and secure the window screen in the kids' bedroom.  Again, Gables failed to do so, and her eldest child, plaintiff M.L., fell from the window of their fourth floor apartment, suffering significant injuries.  These well-pled allegations suffice to state a negligence claim under D.C. law.

6.     **Ms. Long's lease with Gables is a contract, which Gables breached.**  Gables failed to adhere to numerous provisions of the Lease (as defined below), including failure to repair items upon request and failure to enforce the provisions that would have permitted Ms. Long quiet enjoyment of her apartment, rather than face harassment from her neighbor.

7.     **In the course of its interactions with and against Ms. Long, Gables repeatedly facilitated trespass.**  In the middle of the night, Gables opened Ms. Long's apartment for the police, who had no warrant, and without notice or warning to Ms. Long.  Gables caused these shocking and intentional intrusions to Ms. Long's residence, and the Complaint's detailed allegations of those intrusions adequately state claims for trespass under D.C. law.

In short, Gables has not established it is entitled to dismissal of any of Plaintiffs' claims. Therefore, and as discussed in detail below, Gables' Motion to Dismiss should be denied.

## BACKGROUND

In early 2020, Plaintiff Dasha Long, then a 20-year old Black woman with two children, then aged 2 years and 11 months, was living in a shelter for homeless families.  Through assistance

from the D.C. government, Ms. Long and her two children moved into Unit 4015 at The Berkshire on April 9, 2020.  Compl. ¶¶ 11, 20, 22.

The Berkshire is located in a historically white neighborhood of D.C.  Compl. ¶ 3.  The Berkshire is owned by defendant Berkshires Apartments, LLC (the "Berkshire Defendant"), ECF No. 40-2 at 1, and is managed by Gables (collectively, "Defendants").[2]  Compl. ¶ 23; Mem. at 4.

In October 2020, about six months after she moved into The Berkshire, Ms. Long gave birth to her third child, who also lived with her.  The Long family lived at The Berkshire until, unable to stand the harassment they had endured and Defendants' failure to intervene on the family's behalf, Ms. Long gave notice of her intent to vacate the unit in November 2020.  Compl. ¶¶ 9, 85-86.  Ms. Long eventually found a new home and moved out in June 2021.  Compl. ¶ 87.

Ms. Long's rental lease (the "Lease") is an extensive document comprising 72 pages, with numerous incorporated addenda, plus an electronic signature audit trail.  ECF No. 2.  A single individual signed the Lease on behalf of "Berkshire Apartments, LLC" and/or Gables under various roles as reflected in the signature blocks throughout the Lease.  *See* ECF No. 2 at 7, 8, 14-28, 36-40, 43, 45, 49, 53, 54, 57, 60, 64.

The Lease addresses duties and responsibilities of the owner and the tenant, as well as other aspects of residing at The Berkshire, including "Policies and Procedures" and Gables' "Policies and Regulations" ("Gables Policies").  ECF No. 2.  The Lease further contains provisions instructing tenants on repairs, parking, pest control, and utilities.  *Id.*  The Lease also incorporates statutory provisions from D.C.'s Housing Code ("D.C. Housing Code").  ECF No. 2 at 28-35.

---

[2]     Gables states it is "responsible for managing Berkshires Apartments, LLC" (Mem. at 4), which highlights questions of fact as to the responsibilities and any delegated authority between the two Defendants.  As Gables filed a Motion to Dismiss under Rule 12(b)(6), those issues are not before the Court in this Opposition.  However, they are at issue in the Berkshire Defendant's Motion for Summary Judgment and are addressed in Plaintiffs' opposition to that motion.

**The harassment begins as soon as the Long family moves into The Berkshire.**

The Lease began April 9, 2020.  ECF No. 2 at 8.  Starting the very day she moved in, Ms. Long began to experience a hostile housing environment on the basis of her race and familial status as a result of ongoing harassment by her neighbor, which Defendants facilitated.  Compl. ¶ 32.

Specifically, Ms. Long and her children were one of the few Black households in The Berkshire, and the only Black family on her floor.  Compl. ¶¶ 3, 21.  On the first night Ms. Long moved into her unit, whenever her baby would cry, Ms. Long's neighbor in Unit 4016 would bang violently on the wall.  Compl. ¶ 32.  The day after the Long family moved in, Ms. Long overheard the same neighbor say to The Berkshire's property manager: "Why do you have Black people living here?"  Compl. ¶ 33.  The neighbor proceeded to request that Ms. Long and her children be moved to a different floor.  Compl. ¶ 33.

This same neighbor proceeded to call D.C.'s Metropolitan Police Department ("MPD") multiple times to complain that Ms. Long's baby was crying.  The neighbor did so at least four times at night, and then a fifth time during the day to complain the children were making noise.  Compl. ¶¶ 34, 39, 46-47.  The first and most egregious instance occurred on April 11, 2020—two days after the Long family moved in.  Compl. ¶¶ 37-39.  In response to the neighbor's 911 call, MPD entered Ms. Long's unit at 2:30 a.m., without a warrant—in violation of her Lease, and without even attempting to notify Ms. Long or obtain her consent—all because the Gables' concierge permitted MPD to do so.  Compl. ¶¶ 36-37, 39, 42, 44.  Not only was Ms. Long forced to deal with an unwarranted, unannounced, and unwelcome intrusion by MPD officers into her home in the middle of the night, but Ms. Long was also forced to wake up her 11-month-old baby as part of a supposed "wellness check" requested by her neighbor.  Compl. ¶ 40.  These complaints and MPD "visits" took place within a few weeks of the Long family's move into The Berkshire.  Compl. ¶ 34.

**Ms. Long reports the hostile housing environment, and Defendants fail to investigate.**

Ms. Long repeatedly reported to Gables the discriminatory conduct and harassment she experienced at her neighbor's hands.  Shortly after overhearing her neighbor speak in a derogatory fashion about Ms. Long's race and ask The Berkshire's property manager to relocate Ms. Long and her family, Ms. Long reported the incident to Gables.  Compl. ¶¶ 4, 35.  She later followed up with additional reports to property management in which Ms. Long stated that she suspected the neighbor's complaints were rooted in racial animus.  Compl. ¶ 63.

For example, on May 5, 2020, less than a month after moving in, Ms. Long complained by phone to Gables' concierge about the fact that her neighbor constantly banged on Ms. Long's wall.  Compl. ¶ 68.  In an email response, property manager José Alvarado ("Mr. Alvarado") responded by saying that he would investigate; he never followed up.  Compl. ¶ 68.  Gables did nothing to address the conduct or to investigate the reported incidents.  Compl. ¶ 4.

Ms. Long's social worker, Lakeda Jackson, also attempted to resolve some of these issues.  For example, around April 14, 2020, mere days after Gables and MPD first intruded into Ms. Long's apartment without her consent, Ms. Jackson and her supervisor contacted Mr. Alvarado to inquire about the noise complaints and police incidents relating to Ms. Long.  Compl. ¶ 59.  Rather than address the behavior of Ms. Long's neighbor or the fact that The Berkshire concierge had permitted MPD to enter Ms. Long's unit in the middle of the night without notifying her, Mr. Alvarado told Ms. Jackson that Ms. Long had to put her children to bed by 10:00 p.m. in accordance with the building's "quiet hours" policy.  Compl. ¶ 59.  As the Complaint alleges, Ms. Long believes either that this policy does not exist, and/or is not equally enforced.  Compl. ¶ 60.

Lest there be any doubt, the Lease gave Gables the power to intervene and take action to stop the conduct of Ms. Long's neighbor, because the neighbor's activities violated the terms of the Lease, including the Gables Policies.  *See, e.g.*, ECF No. 2 at 9-10, 50.  Indeed, the Lease, and

the Gables Policies incorporated therein, expressly prohibit one resident from disrupting other tenants' quiet enjoyment of their unit.  Compl. ¶¶ 28 (citing to paragraph 15 of the Lease), 69; *See also* Compl. ¶ 29 (prohibiting "disturbance[s]").  Yet, when told of Ms. Long's neighbor's problematic and racist behavior, Defendant Gables' property manager, Mr. Alvarado, hardly acknowledged Ms. Long's complaint.  Compl. ¶ 63.  Instead, he told Ms. Long that neighbors pay to live in peace and threatened to issue her a 30-day notice to cure or quit if Ms. Long was not able to get her baby to stop crying at night.  Compl. ¶ 64.

In contrast to how it handled Ms. Long's reports, the Complaint alleges that, as part of its normal practice, Gables generally investigates complaints made by residents of The Berkshire about noise disturbances and tenants disturbing other tenants.  Compl. ¶ 69.  Gables simply chose not to do so for Ms. Long's complaints.

Indeed, to make matters worse, Gables' employees actively facilitated the hostile housing environment to which the Long family was subjected.  For example, the first time that Ms. Long's neighbor called MPD, Gables' agent unlocked Ms. Long's door and allowed MPD to enter in the middle of the night without a warrant, and without contacting Ms. Long first.  Compl. ¶¶ 36, 42, 45.  The pretext, as Ms. Long learned, was for MPD to conduct a "wellness check," but her baby was not crying when MPD arrived.  Compl. ¶¶ 35, 39, 41.  On April 24, 2020, just a few weeks later, Gables *again* opened the Long residence to MPD without notice or a warrant.  Compl. ¶¶ 50-55.  The supposed reason this time was to serve a barring notice on the father of Ms. Long's children, who was not present in The Berkshire unit.  Compl. ¶ 54.

**Defendants retaliate against Ms. Long after she seeks legal representation to address the discriminatory harassment and conduct at The Berkshire.**

As a result of Gables' failure to remedy the harassment and its affirmative role in furthering a hostile housing environment, Ms. Long secured legal counsel.  Compl. ¶¶ 8, 71, 75.  Gables

received demand letters from Ms. Long's attorneys around May 18, 2020 and on July 23, 2020. Compl. ¶¶ 70-71, 75, 148, 192.  Each letter demanded that Gables cease and desist from conduct that had created a hostile housing environment for Plaintiffs.  Compl. ¶¶ 71, 75, 148, 192. Defendants were thus on notice that Ms. Long had sought legal recourse as of mid-May 2020.

On May 19, 2020, the day after receiving the first demand letter, Plaintiff's social worker, Ms. Jackson, requested incident reports concerning MPD's latest unauthorized entry.  Compl. ¶¶ 70, 72.  Mr. Alvarado responded via email, stating that The Berkshire had received communication from Ms. Long's attorneys and further communication would be through its attorneys.  Compl. ¶ 72.

From that point forward, Defendants required that Ms. Long submit all routine maintenance requests through her attorneys.  Compl. ¶¶ 73, 76.  Moreover, Gables further retaliated against Ms. Long by failing to timely make most of the requested repairs.  Compl. ¶¶ 77, 79.  The Complaint alleges that Gables does not refuse to address other tenants' repairs for extended periods of time, nor does Gables require other tenants to communicate via counsel to Gables' counsel for routine landlord/tenant issues.  Compl. ¶ 81.

**The hostile housing environment Defendants facilitated drives the Long family out of their home.**

Gables' facilitation of a hostile housing environment for the Long family and Gables' failure to act to remedy the neighbor's harassment led Plaintiffs to stay overnight with family and friends or in hotels on many nights, to avoid further hostility from the neighbor and/or further unwarranted intrusions by MPD, facilitated by Gables.  Compl. ¶ 88.  When Ms. Long did stay in her apartment, she and her children would sleep together in one bedroom with the door locked, in case Gables again decided to let MPD into her unit in the middle of the night without basis or her consent.  Compl. ¶ 89.  On November 6, 2020, Ms. Long sent Defendants notice of her intent to

vacate the unit, stating that she was leaving because of the hostile housing environment she and her family had endured.  Compl. ¶¶ 85-86.  She ultimately left the unit in June 2021.

## ARGUMENT

To satisfy Federal Rule of Civil Procedure 8, a complaint must include a "short and plain statement of the claim showing that [plaintiff] is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This is to "give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The allegations of a complaint are liberally construed in plaintiffs' favor when evaluating Rule 12(b)(6) motions.  *Warren v. District of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004).  Courts "accept as true all [the] factual allegations in the complaint, and give plaintiff the benefit of all inferences that can be drawn from the facts alleged."  *Dickens v. D.C.*, Civil Action No. 05-355 (EGS), 2007 WL 495801, at *2 (D.D.C. Feb. 12, 2007) (*citing Atchinson v. District of Columbia,* 73 F.3d 418, 422 (D.C. Cir. 1996)).  A complaint states a plausible claim for relief when it contains sufficient factual matter that, when construed in plaintiff's favor, permits the Court to "draw the reasonable inference that defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Gables does not contest that the Court should exercise supplemental jurisdiction over Plaintiff's D.C. law claims if any federal claim proceeds.  Mem. at 25.  Plaintiffs similarly urge the Court to exercise jurisdiction pursuant to 28 U.S.C. § 1367 to hear their D.C. law claims.  In assessing whether to exercise supplemental jurisdiction, the court should consider "judicial economy, convenience and fairness to litigants."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  *See also Carnegie-Mellon Univ. v. Cohill*¸ 484 U.S. 343, 350 (1988).  If claims share a "common nucleus of operative fact," a court would "ordinarily" try them in a single

proceeding.  *United Mine Workers*, 383 U.S. at 725.  Thus, where state law claims form part of the same dispute as federal claims, supplemental jurisdiction is appropriate.  28 U.S.C. § 1367.

## I.   PLAINTIFFS' COMPLAINT PLAUSIBLY ALLEGES CLAIMS FOR HOSTILE HOUSING ENVIRONMENT BASED ON RACE AND FAMILIAL STATUS

The facts alleged, accepted as true and construed in Plaintiffs' favor, establish well-pled claims of a hostile housing environment on the basis of race and familial status under federal and D.C. law.[3]  The Court should therefore deny Gables' motion to dismiss Counts II, III, VIII, and IX.

### A.   The Court Can Rely on Recent Implementing Regulations to Assess the Sufficiency of Plaintiffs' Hostile Housing Environment Claims

The FHA makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [S]ection . . . 3604. . . ." 42 U.S.C. § 3617.[4]

Where, as here, Congress has not directly addressed the legal standard for evaluating hostile housing environment claims under the FHA, nor liability for the actions of third parties under the statute, deference to the regulations by HUD and the standards prescribed therein issued pursuant to delegated authority, is appropriate.[5]  *See Chevron U.S.A. Inc. v. Natural Res. Def.*

---

[3]   D.C. courts interpreting the D.C. Human Rights Act ("DCHRA") follow federal courts for guidance in interpreting federal anti-discrimination statutes.  *Whitbeck v. Vital Signs, Inc.*, 116 F.3d 588, 591 (D.C. Cir. 1997). *See also Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393, 405 (D.D.C. 1996) ("[T]he D.C. law is applied in the same manner as the parallel federal antidiscrimination provisions.").  Accordingly, Plaintiffs address the parallel claims together and request that the Court consider Plaintiffs' arguments in support of their FHA claims when assessing Plaintiffs' counterpart DCHRA claims.

[4]   The parallel D.C. statute is D.C. Code § 2-1402.61(a).  Complaint Counts VIII and IX.

[5]   Under 42 U.S.C. § 3608(a) of the FHA, Congress gave the Secretary of HUD, "[the] authority and responsibility for administering this Act."  HUD also has general rulemaking authority under the Department of Housing and Urban Development Act to make such rules and regulations as may be necessary to carry out its functions, powers and duties. *See* 42 U.S.C. § 3535(d).

*Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("If Congress has explicitly left a gap for the agency

to fill, there is an express delegation of authority to the agency to elucidate a specific provision of

the statute by regulation.  Such legislative regulations are given controlling weight unless they are

arbitrary, capricious, or manifestly contrary to the statute.").   Accordingly, the regulations

regarding hostile housing environment claims, reflected in 24 C.F.R. § 100.600(a), should control

here.

Under those regulations, a hostile housing environment exists where there is "unwelcome

conduct that is sufficiently severe or pervasive as to interfere with . . . the use or enjoyment of a

dwelling" based on a protected trait, including race and familial status.  24 C.F.R. § 100.600(a)(2).[6]

A party is directly liable for "[f]ailing to take prompt action to correct and end a discriminatory

housing practice by that person's employee or agent, where the person knew or should have known

of the discriminatory conduct[,]" *and* for "[f]ailing to take prompt action to correct and end a

discriminatory housing practice *by a third-party*, where the person knew or should have known of

the discriminatory conduct and had the power to correct it."   24 C.F.R. § 100.7(a)(1)(ii)-(iii)

(emphasis added).  *See also Myers v. District of Columbia Hous. Auth.*, No. 10-CV-700, 2022 WL

3715795, at *5-6 (D.D.C. Aug. 29, 2022) (analyzing Fair Housing Act claims pursuant to 24

C.F.R. § 100.600 and denying defendants' motions for summary judgment, confirming vicarious

liability and holding that the question of whether an individual's "alleged harassment…was aided

by the agency relationship…is better left to the jury"); *Cudjoe v. Watermark Villas at Quail N.,*

*LLC*, Case No. CIV-17-1068-D, 2019 WL 1212932, at *3 (W.D. Okla. Mar. 14, 2019) (denying

---

[6]     The regulations codifying the prohibitions in 24 C.F.R. § 100.600 are relatively recent.  The final rule was
adopted HUD on September 14, 2016 and made effective on October 14, 2016.  *See* 81 Fed. Reg. Vol. 178, 63054
(Sept. 14, 2016).  *Available at* https://www.govinfo.gov/content/pkg/FR-2016-09-14/pdf/2016-21868.pdf  (last
accessed June 9, 2023).

motion to dismiss FHA claims based on same CFR provision—24 C.F.R. § 100.600) (internal citation omitted); *West v. DJ Mortg. LLC*, 271 F. Supp. 3d 1336, 1335 (N.D. Ga. 2017) (analyzing claims under § 3617, and pursuant to the newly passed 24 C.F.R. § 100.600, confirming vicarious liability and noting that in some cases an agent may have been "aided in accomplishing the tort" by the agency relationship).

The HUD regulations require considering the "totality of the circumstances," including "the nature of the conduct, the context in which the incident(s) occurred, the severity, scope, frequency, duration, and location of the conduct, and the relationships of the persons involved." 24 C.F.R. § 100.600(a)(2)(i)(A). Harassment can consist of "written, verbal, or other conduct, and does not require physical contact." 24 C.F.R. § 100.600(b). The harassment that creates a hostile housing environment need not have caused a "change in the economic benefits, terms, or conditions … of the housing-related services or facilities." 24 C.F.R. § 100.600(a)(2). Indeed, "[a] single incident of harassment because of race … [or] familial status … may constitute a discriminatory housing practice, where the incident is sufficiently severe to create a hostile environment." 24 C.F.R. § 100.600(c).

### B.   Discriminatory Intent is Not Required to Adequately Plead a Hostile Housing Environment Claim

Contrary to Gables' argument (Mem. at 2, 9-10, 18-22), discriminatory intent is not required in order to succeed on a Section 3617 hostile housing environment claim.

On this point, the Court should follow the more persuasive analysis reflected in *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856 (7th Cir. 2018). In *Wetzel*, the Seventh Circuit found the FHA creates liability not only for landlords who act with discriminatory intent, but also for landlords *who have actual notice* of tenant-on-tenant harassment based on protected status, but do not take steps to correct it. *Wetzel*, 901 F.3d at 859.

12

In this way, *Wetzel* closely mirrors the 2016 HUD regulations in holding that a hostile-housing-environment claim requires a plaintiff to show that: (1) she endured unwelcome harassment based on a protected characteristic; (2) the harassment was severe or pervasive enough to interfere with the terms, conditions, or privileges of her residency, or in the provision of services or facilities; and (3) there is a basis for imputing liability to the defendant. *Id.* at 861-62. *See also Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017) (listing elements of a Title VII hostile-workplace claim); *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996); *accord Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993) (adopting elements of a Title VII hostile-workplace claim for the FHA).

Although the hostile housing discrimination cause of action shares some similarities with a complaint for a hostile work environment, the FHA's enabling regulations—specifically, 24 C.F.R. §§ 100.600 and 100.7—explicitly disclaim other aspects of the hostile work environment analysis under Title VII.   In particular, and as relevant here, 24 C.F.R. § 100.7 rejects the affirmative defenses available under Title VII.  *See* 81 Fed. Reg. Vol. 178, 63054, at 63072 (Sept. 14, 2016) (explaining that HUD intentionally rejected importing the affirmative defense provisions from Title VII into the hostile housing environment context).[7]  In short, while some aspects of analysis from other remedial civil rights statutes may apply to an FHA (Title VIII) claim, the reasoning from Title VII claims should not, as Gables attempts to do, be mapped whole cloth onto a hostile housing discrimination claim.

That is particularly true where, as here, the applicable federal agency has subsequently issued regulations that address certain aspects of existing case law.  Indeed, the Seventh Circuit in

---

[7]     *Available at* https://www.govinfo.gov/content/pkg/FR-2016-09-14/pdf/2016-21868.pdf (last accessed June 9, 2023).

*Wetzel* recognized the differences between a landlord-tenant relationship and an employer-employee relationship and thus did not rely on Title VII cases to find the landlord liable.  *Wetzel*, 901 F.3d 856, 863.  Instead, the court turned to Title IX cases to analyze the landlord's conduct. *Id.* at 856, 864.  It reasoned that, if the landlord had actual knowledge of the severe harassment Wetzel was enduring and was deliberately indifferent to it, then the defendant landlord had subjected Wetzel to conduct that the FHA forbids.  *Id.*  As the Seventh Circuit put it, "[c]ontrol in the absolute sense … is not required for liability.  Liability attaches because a party has 'an arsenal of incentives and sanctions . . . that can be applied to affect conduct' but fails to use them."  *Id.* (*quoting Dunn v. Wash. Cty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005) (alteration in original)).

By contrast, Gables argues that this Court should adopt the reasoning of *Francis v. Kings Park Manor*, which held that hostile housing environment claims under Section 3617 must allege that the defendant acted with discriminatory intent or animus and that a landlord cannot be presumed to have enough control over tenants to impose liability under the FHA for tenant-on-tenant harassment.  992 F.3d 67, 81-82 (2d Cir. 2021).  In arriving at its opinion, the Second Circuit relied on guidance from Title VII cases and invoked the *McDonnell-Douglas* burden-shifting framework to conclude that discriminatory intent was required for FHA claims not based on direct evidence.  *Id.* at 73.  This analysis was wrong for several reasons.

*First*, the burden-shifting framework reflected in *McDonnell-Douglas* addresses the burdens of proof between parties, which themselves are inapplicable at the motion to dismiss stage. *See, e.g.*, *Ring v. First Interstate Mortg., Inc.*, 984 F.2d 924, 925-27 (8th Cir. 1993) (reversing dismissal of FHA claim where lower court applied an evidentiary standard because "[u]nder the Federal Rules of Civil Procedure, an evidentiary standard is not a proper measure of whether a complaint fails to state a claim"); *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997)

14

(holding that although the *McDonnell-Douglas* standard "orchestrates the burdens of proof . . . it does not dictate the required elements of a complaint").  On this basis alone, Gables' reliance on *Francis* is misplaced.

*Second*, HUD explicitly disagreed with the underlying *Francis* ruling from the district court,[8] calling it the "sole exception" to the proposition that discriminatory intent is necessary to find a housing provider liable for its negligent failure to remedy discriminatory conduct by a third-party, or resident-on-resident discriminatory conduct.  *See* 81 Fed. Reg. Vol. 178, 63054, at 63068 (Sept. 14, 2016).  HUD enacted the hostile housing environment and liability regulations implicated here (24 C.F.R. §§ 100.600 and 100.7) on top of its explicit rejection of the *Francis* premise.  This Court should similarly reject Gables' invitation to adopt *Francis*, and instead follow HUD's well-considered approach.

### C.   Ms. Long's Well-Pled Allegations State a Claim for Hostile Housing Environment Discrimination

Plaintiffs alleged that, from the moment Ms. Long and her children moved into The Berkshire, they were subjected to unwelcome, pervasive, and severe conduct from their next-door neighbor.  *See, e.g.*, Compl. ¶¶ 4, 6, 32-34, 41, 46-47.  There are a number of incidents to which Ms. Long and her minor children were subjected, some of which may be sufficient on their own to state a claim for a hostile housing environment.  *See, e.g.*, *Monus v. Riecke*, Civ. No. 21-218, 2021 WL 1721010 (E.D. La. Apr. 30, 2021) (denying motion to dismiss hostile housing environment claim because single alleged incident was sufficient to state a claim); *West*, 271 F. Supp. 3d at 1352  ("Even one act of harassment, if it is severe enough, may support a claim").

---

[8]        That is the decision affirmed by the Second Circuit, *Francis*, 992 F.3d 67, on which Gables relies.

Here, the harassment began when the Long family's neighbor made an explicitly racist and anti-families remark *to Gables staff*.  Compl. ¶ 33 (alleging Ms. Long overheard the neighbor ask Mr. Alvarado why they had "Black people living [there]" and request that Ms. Long *and her children* be moved to a different floor).  The neighbor's communication was directed to Gables' staff, Ms. Long reported to them that she heard it, and Gables took no action to disclaim, refute, or otherwise stop the discriminatory conduct.  Compl. ¶¶ 33, 35, 63.

The Complaint further alleges that the harassing and discriminatory actions continued after that initial encounter.  Any time Ms. Long's children made noise during the night—as infants and young children often do—her adjacent neighbor banged on the wall of her apartment violently, in violation of the Lease.  Compl. ¶¶ 28, 29, 32.  The neighbor further made at least four nighttime calls to MPD complaining that Ms. Long's baby was crying.  Compl. ¶¶ 34, 39, 46.  Then the neighbor called MPD for at least a fifth time, during the day, to complain about Ms. Long's children making noise while playing.  Compl. ¶ 47.  The motivation behind the harassment of Ms. Long and her family, *and Gables' knowledge of it*, is further belied by the fact that the neighbor requested a "wellness check" by MPD mere days after making a racially discriminatory remark about Ms. Long to Gables' staff.  Compl. ¶¶ 33, 37.

Yet, despite its knowledge of the animus harbored by Ms. Long's neighbor (Compl. ¶ 33), there is no indication that Gables' staff made efforts to disabuse MPD of the basis of its tenant's calls (Compl. ¶¶ 35-36, 44-45), to stop Ms. Long's neighbor's inappropriate behavior, or even to notify Ms. Long before MPD arrived.  Moreover, *Gables let MPD into her home*.  Compl. ¶¶ 37, 42-45.

Gables also furthered the hostile housing environment itself; it opened Ms. Long's apartment multiple times to allow MPD to enter without warning to Ms. Long or an apparent legal

16

basis.  In one instance, Gables did so to facilitate a wellness check based on the neighbors' report that a baby was crying, and in the other to facilitate serving a barring notice on her children's father, who was not even at the apartment at the time.  Compl. ¶¶ 37, 42-44, 50-56.

Despite these facts, Gables attempts to invalidate any claim of responsibility by relying on a decision of another Judge in this Court (Judge Mehta) dismissing a plaintiff's FHA claims. (Mem. at 10, 13, 16-18) (citing *Dyson v. Dutko Ragen Homes & Invs.*, No. 21-CV-02280, 2022 WL 1294484 (D.D.C. Apr. 27, 2022)).  Gables' reliance on that decision is misplaced, however, based on just a cursory review of the facts of the *Dyson* case (which Gables notably neglected to mention in its motion).

Specifically, in *Dyson*, the plaintiff brought claims under the FHA against multiple defendants—namely Real Property Management Pros ("RPMP"), a property management company, Keller Williams, a realty services team, and Tasheika Penn, an agent of Keller Williams. *Id.* at *1.  Most notably, the plaintiff alleged violations of the FHA when RPMP reneged on a previously agreed lease between RPMP and the plaintiff.  *Id.*  In addition to his claim against RPMP, plaintiff brought claims alleging FHA violations against Keller Williams and Penn, purportedly attempting to impute liability on the realty services firm for failure to take action when Keller Williams and Penn became aware of RPMP's alleged racial discrimination. *Id.* at *5.

Though Gables argues that *Dyson* controls in this case (Mem. at 16-18), these distinct facts actually make Dyson inapposite here.  Indeed, the plaintiff in *Dyson* nowhere alleged the existence of an agency relationship between Penn and RPMP, such that Penn should be held directly or vicariously liable for RPMP's allegedly discriminatory behavior.  First Amended Complaint, *Dyson*, 2022 WL 1294484.  Instead, the plaintiff in *Dyson* attempted to hold liable a third-party realtor and realty firm—who were neither employees nor agents of the property manager, RPMP—

merely because they "witnessed the violations occurring" and "took no action." *Dyson*, 2022 WL 1294484, at *6. On these facts, the Court held that a third party, ***with no relationship whatsoever*** to the party directly committing the FHA violations, cannot subsequently be held liable for failing to act on such violations.

This is a far cry from the Complaint here, which specifically seeks to hold liable Gables and its employees for their failure to cure the misconduct of a tenant with whom Gables shares an express contractual relationship, that of landlord-tenant.[9] Further, unlike in *Dyson*—where neither Keller Williams nor RPMP had the ability to control the other—Gables was expressly given the power to address and mitigate the neighbor's conduct under the Lease when the neighbor's malicious intent became evident, by issuing a notice to cure or quit demanding that the neighbor cease their objectionable behavior, evicting the neighbor (for violating the Lease), or by simply refusing to take the neighbor's requested action (such as allowing MPD into Ms. Long's apartment without her permission). In short, the realty firm and realtor in *Dyson* had no authority to regulate the behavior of a property management company operating independently of her realty services; here, by contrast, Gables clearly had the right and authority to regulate the neighbor's behavior. Gables simply chose not to do so.

Simply put, the *Dyson* court's dismissal of FHA claims against a realtor, wholly unconnected to the property management company that allegedly committed the primary FHA violations, should have no bearing on the liability of a landlord for racially discriminatory actions conducted by a tenant, with whom the landlord has an existing relationship allowing the landlord to mitigate the misconduct of said tenant.

---

[9] The Complaint alleges, upon information and belief, that "any tenant who resides at The Berkshire has signed a lease with Gables governing rentals at The Berkshire and must comply with all Gables' lease obligations as a result." (Compl. ¶ 26).

As such, these facts set forth both below and throughout this memorandum, as well as others detailed in the Complaint, plausibly allege a claim for a hostile housing environment on the basis of race and familial status, which impeded Plaintiffs' full use of their apartment.  This is all that is required for Plaintiffs to meet their burden on a motion to dismiss.[10] *See Wetzel*, 901 F.3d at 861-62. For all these reasons, Gables' motion should be denied.

1.     ***Gables knew or should have known about the harassment of Ms. Long and her young children and failed to take action to correct it***

Gables, through its agents, knew of the harassment to which Plaintiffs were subject at the hands of their neighbors and took no action to stop it.  "Under the FHA, a p[arty] may be directly liable…[f]or failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the p[arty] knew or should have known of the discriminatory conduct and had the power to correct it."  24 C.F.R. § 100.7.

By failing to investigate the veracity of the neighbor's noise complaints about Ms. Long's young children, Gables created and allowed a hostile housing environment to continue.  Compl. ¶ 35.  Moreover, Gables took no steps to protect Ms. Long from the racial animus or the harassment arising from it, despite their knowledge of the neighbor's behavior and comments.  Compl. ¶ 35. Specifically, during the week of April 14, 2020, days after Gables and MPD intruded into the Long family's apartment in the middle of the night, Ms. Long's social worker, Lakeda Jackson, and her supervisor contacted Mr. Alvarado, to inquire about the noise complaints and police incidents relating to the Long family.  Compl. ¶ 59.  Mr. Alvarado told Ms. Jackson that Ms. Long had to

---

[10]     Whether conduct was "sufficiently severe or pervasive as to 'interfere'" with Ms. Long's housing rights or there is a causal connection, are factual questions for the jury and therefore not an issue that is before the Court at this juncture.  *See, e.g.*, *Revcock v. Cowpet Bay W. Condo. Assn'n*, 853 F.3d 96, 115 (3d Cir. 2017) (reversing summary judgment where a reasonable jury could find the alleged conduct was "sufficiently severe or pervasive").  A reasonable jury may find it was, because "[h]arassment that intrudes upon the 'well-being, tranquility, and privacy of the home' is considered particularly invasive."  *Id.* at 113 (*quoting Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).

put her children to bed by 10:00 p.m. in accordance with the building's "quiet hours" policy (10 pm–6 am, daily).  Compl. ¶ 59.

Ms. Long made a subsequent attempt to resolve the noise complaint matter, during which Mr. Alvarado again said that his main concern was Ms. Long's baby crying.  Compl. ¶ 62.  Even when explicitly put on notice by Ms. Long that she believed the neighbor was targeting her because of her race, Mr. Alvarado remained silent and did not respond.  Compl. ¶ 63.  Instead, Mr. Alvarado said the neighbors pay to live in peace, and made clear that Gables would issue Ms. Long a 30-day notice to quit if Ms. Long's infant did not stop crying at night, allegedly in violation of the "quiet hours" policy.  Compl. ¶ 64.

Where, as here, "a landlord [] has actual notice of tenant-on-tenant harassment based on a protected status, yet chooses not to take any reasonable steps within its control to stop that harassment," the FHA creates liability for failure to take steps to stop the harassment, regardless of any discriminatory animus.  *Wetzel*, 901 F.3d at 859; 24 C.F.R. § 100.600.  *See also* 81 Fed. Reg. 63054, 63068 (Sept. 14, 2016) ("HUD does not agree that a housing provider's failure to act to correct third-party harassment must be motivated by a discriminatory intent or animus before the provider can be held liable for a [FHA] violation.").

Indeed, the facts pleaded in the Complaint fit squarely within the conduct made actionable under 24 C.F.R. §100.600 and 24 C.F.R. § 100.7.  *See* 81 Fed. Reg. 63054, 63067 (Sept. 14, 2016) (rejecting calls to clarify liability for actions by a "third-party" because within the context of the rule, third-party refers to a "non-employee or non-agent who engaged in . . . hostile environment harassment of which the housing provider knew or should have known and had the power to correct").  *See also Cudjoe*, 2019 WL 1212932, at *3; *West*, 271 F. Supp. at 1335.

Despite the facts detailed above, Gables cites case law beyond this jurisdiction for the purported principle that "[a] mine-run landlord-tenant relationship will not suffice for liability under section 100.7(a)(iii)." (Mem. at 14) (citing *Harris v. Vanderburg*, 584 F. Supp. 3d 82, 94 (E.D.N.C. 2022). However, much like the ruling in *Dyson*, the *Harris* case is similarly distinguishable.

Specifically, in *Harris*, the Court held that a property manager was not vicariously or directly liable under the FHA for discriminatory conduct by a neighboring tenant, but ***not*** because the existence of a landlord-tenant relationship was insufficient to create liability. *Harris*, 584 F. Supp. 3d at 82, 97-99. Indeed, there was no landlord-tenant relationship between the property management company and the tenant in *Harris* and thus no "substantial control" over the tenant who harassed Plaintiffs. *Id*. at 94-95. Rather, the Court refused to impute liability to the defendant property managers because they never managed the harassing neighbor's unit at any point, nor was the harassing neighbor ever a tenant of the property manager. *Id.* at 94.

Therefore, the singular principle that Gables extrapolates from the entire *Harris* ruling is merely dicta; the Court's off-hand reference to whether a landlord-tenant relationship suffices for FHA liability was irrelevant.

Here, by contrast, Gables both manages the harassing neighbor's unit and has a lease agreement with that neighbor. Accordingly, the facts pleaded in the Complaint fit squarely within the liability contemplated by the FHA and are sufficient to state a claim under the governing HUD regulations. 24 C.F.R. § 100.7.

### 2. The Lease provides additional reasons why Defendants' conduct is actionable under the 2016 Hostile Housing Environment Regulations

While Gables argues that it had no power to address tenant-on-tenant harassment (Mem. at 17-18), its Lease with Ms. Long states otherwise. The Lease explicitly prohibits tenants from

"*behaving in a loud or obnoxious manner*" and "*disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community.*"  Compl. ¶ 28, *citing* ECF No. 2 at 10.  And it reserved to Defendants themselves the right to exclude from the "apartment community guests, visitors or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules and community policies, or disturbing other tenants, neighbors, visitors, or owner representatives."  Compl. ¶ 15.

These provisions specifically grant Gables (and/or the Berkshire Defendant) authority to intervene when tenants engage in prohibited conduct.  Further, even though Gables argues it could not control the actions of tenants like Ms. Long's neighbor, Gables' conduct shows it believed otherwise at the time: when Ms. Long's neighbor complained that Ms. Long's baby was crying at night, Gables' staff threatened to issue Ms. Long a 30-day notice to quit if she did not stop her baby from crying.  Compl. ¶¶ 7, 64.[11]

On a motion to dismiss, the Court is required to "liberally construe[]" the allegations in the Complaint "in plaintiffs' favor."  *Warren*, 353 F.3d at 37; *Dickens*, Civil Action No. 05-355 (EGS), 2007 WL 495801, at *2 (citation omitted).  To the extent there is a question about Gables' authority to enforce these Lease provisions, that is a question of fact that cannot be resolved on a motion to dismiss.  *See also*, *infra* Section VI (analyzing breach of contract claims arising from the Lease).

Given the arsenal of remedies available to it, and Defendants' failure to intervene to stop the harassment Plaintiffs faced, along with its own actions facilitating the harassment of Ms. Long

---

[11]     The absurdity of Defendants' position is further reflected by the fact that Defendant Gables states it has no responsibility to control the environment of the building it operates (despite the express terms of the Lease) (Mem. at 17-18), while the Berkshire Defendant argues that it had no employees and no right to supervise or dictate what happened at The Berkshire.  ECF No. 39-1 at 7-8.  In short, Defendants, by their own assertions, run an apartment building in D.C., but no one is actually responsible for running it, let alone ensuring that the provisions of its leases, including Plaintiffs' Lease, are enforced.  This makes no sense.

and her family, Plaintiffs have plausibly pled claims that Defendants acted with deliberate indifference and can be held liable for the hostile housing environment they facilitated, in line with HUD's regulations and *Wetzel*.  The Court should therefore deny Gables' motion to dismiss Counts II, III, VIII, and IX, alleging hostile housing environment under federal and D.C. law.

## II.    PLAINTIFFS' COMPLAINT ALLEGED SUFFICIENT FACTS TO PLEAD A RETALIATION CLAIM AGAINST GABLES

Section 3617 of the FHA also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [S]ection 3603, 3604, 3605, or 3606 of [Title 42]." 42 U.S.C. § 3617.  Further, 24 C.F.R. § 100.400(c)(5) prohibits retaliating against any person because that person has participated in any manner in a proceeding under the FHA.

To state a claim for retaliation under 42 U.S.C. § 3617, the plaintiff must plead that: (1) she was engaged in protected activity; (2) the defendant was aware of that activity; (3) the defendant took adverse action against her; and (4) a causal connection existed between the protected activity and the asserted adverse action.  *King v. Rumsfeld*, 328 F.3d 145, 150-51 (4th Cir. 2003) (*citing Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)); *Hall v. Greystar Mgmt. Servs., L.P.*, 637 F. App'x 93, 98 (4th Cir. 2016).

Protected activity under the FHA refers to "action taken to protest or oppose statutorily prohibited discrimination."  *Miller v. Bd. of Managers of Whispering Pines at Colonial Woods Condo. II*, 457 F. Supp. 2d 126, 131 (E.D.N.Y. 2006) (*quoting Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)).  To allege causation, a plaintiff must allege facts that the defendant took the actions it did because of her protected activity.  *Hall*, 637 F. App'x at 98.

A landlord's knowledge that its tenant engaged in a protected activity also is necessary to establish the causal connection needed for a retaliation claim.  *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (dismissing Title VII retaliation claim due to absence of evidence that employer knew that the plaintiff filed a complaint with the agency).  However, where the adverse action occurred "very close" in time to the protected activity, such temporal proximity is sufficient to demonstrate causation.  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).  Similarly, an action alleged to be adverse retaliation which occurs "shortly after" the defendant becomes aware of the protected activity is sufficient to demonstrate causation.  *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004).

Despite Gables' arguments (Mem. at 22-23), the close proximity in time here—between Ms. Long seeking legal counsel and Gables refusing to respond to routine maintenance requests and requiring that these be submitted through counsel—is sufficient to establish the required causal connection for a retaliation claim.

Gables became aware that Ms. Long engaged in protected activity after receiving cease and desist letters from Ms. Long's attorneys around May 18, 2020 and July 23, 2020.  Compl. ¶¶ 70-71, 73, 75, 148, 192.  On May 19, 2020, one day after learning Ms. Long had counsel, through receipt of her first demand letter, Gables' agent, Mr. Alvarado, instructed that all further communication with Ms. Long would have to be through The Berkshire's attorneys.  Compl. ¶¶ 72-74.  This included even routine maintenance requests, in a further break from standard landlord-tenant protocol.  Compl. ¶¶ 73, 76.  And, even following Gables' request that maintenance and repair requests be made through legal counsel, Gables still failed to timely make such repairs.  Compl. ¶ 77, 79, 150.

Plaintiffs' allegations identify that Ms. Long was engaged in a protected activity, that Defendants knew of the protected activity, and that because of it, they very soon thereafter took adverse action against Plaintiffs.  These allegations state a claim for retaliation under 42 U.S.C. § 3617.  Any question of whether the alleged causal connection is sufficient here is premature at this stage of the litigation because it is a question for the jury.  *See Iqbal*, 556 U.S. at 678; *Revcock*, 853 F.3d at 115.

Gables argues that Plaintiffs must allege that Gables acted with discriminatory intent to succeed on a retaliation claim under § 3617.  Mem. at 2, 18-23.  This is wrong.  The statute itself says nothing to suggest a discriminatory intent is required; rather, it broadly protects against interference with the exercise of any rights granted under the FHA.  *Bryant v. City of Norfolk,* Civil Action No. 2:20CV26 (RCY), 2021 WL 765405, at *4 (E.D. Va. Feb. 26, 2021) (holding that plaintiffs met their burden to establish the elements of a claim under § 3617, and that a showing of discriminatory intent was not required).  Moreover, the four-part test for a § 3617 retaliation claim does not include discriminatory intent.  *See*, *e.g.*, *id.*; *Hall*, 637 F. App'x at 98.

For all these reasons, the Court should deny Gables' motion to dismiss Counts VI and X alleging retaliation under federal and D.C. law.

## III.   PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT GABLES DISCRIMINATED OR OTHERWISE MADE HOUSING UNAVAILABLE ON THE BASIS OF FAMILIAL STATUS AND/OR RACE

The Court should deny Gables' motion to dismiss Counts I, IV, and VII, which allege violations of federal and D.C. law arising from, or otherwise making housing unavailable, or discriminating in the terms and conditions of housing based on familial status or race.  Plaintiffs' well-pled allegations are sufficient to state claims for violations of 42 U.S.C. §§ 3604(a) and (b), and the D.C. counterpart.

Section 804 of the FHA makes it unlawful "[t]o refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race . . . [or] familial status." 42 U.S.C. § 3604(a).  *See also Reeves v. Carrollsburg Condo. Unit Owners Ass'n*, No. CIV. A. 96-2495RMU, 1997 WL 1877201, at *5 n.7 (D.D.C. Dec. 18, 1997).  Section 3604 additionally prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of . . . familial status. . . ." 42 U.S.C. § 3604(b).[12]  As the Supreme Court has explained, when construing the FHA, courts are to give "generous construction" to the statute's "broad and inclusive language." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209, 212 (1972).  Congress intended the statute to have a "broad remedial intent." *Alexander v. Riga*, 208 F.3d 419, 425 (3d Cir. 2000) (*quoting Havens Realty v. Coleman*, 455 U.S. 363, 380 (1982)).

HUD's implementing regulations exist to help fulfill that remedial purpose.  The implementing regulation for 42 U.S.C. § 3604(a) identifies certain actions prohibited by § 3604(a), including "[s]ubjecting a person to harassment because of race . . . [or] . . . familial status . . . that causes the person to vacate a dwelling." 24 C.F.R. §100.60(b)(7).  *See also Scutt v. Dorris*, CIV. NO. 20-00333 JMS-WRP, 2021 WL 206356, at *3 (D. Haw. Jan 20, 2021) (*citing* 24 C.F.R. §100.60(b) (relying on HUD's regulation to assess the sufficiency of plaintiff's § 3604(a) claim)).  The regulation interpreting 42 U.S.C. § 3604(b) similarly prohibits "[s]ubjecting a person to harassment because of familial status . . . that has the effect of imposing different terms, conditions, or privileges relating to the . . . rental of a dwelling or denying or limiting services or facilities in connection with the . . . rental of a dwelling." 24 C.F.R. §100.65(b)(7).  *See also Scutt*, 2021 WL 206356, at *3, (*citing* 24 C.F.R. §100.65(b)).[13]

---

[12]     The D.C. analogue to the federal statute is D.C. Code § 2-1402.21(a)(2).

[13]     As with the regulations interpreting hostile housing environment claims and types of liability available under the FHA, *Chevron* deference to the agency's interpretation in evaluating the factual allegations in support of Plaintiffs'

The burden on a plaintiff at the motion to dismiss stage is minimal; not until summary judgment does "the plaintiff bear[] the burden of establishing a *prima facie* case of discrimination." *Martinez v. Optimus Props., LLC*, Case No. 2:17-cv-03581-SVW-MRW, 2018 WL 6039875, at *5 (C.D. Cal. June 6, 2018) (citation omitted).   The question here, before discovery, is simply whether the allegations pled a "plausible" claim to relief under 42 U.S.C. §§ 3604(a) and 3604(b). *Twombly*, 550 U.S. at 570.

The Complaint meets this burden.   Under 42 U.S.C. § 3604(a), the Complaint alleges that Ms. Long's neighbor began harassing Ms. Long and her children the same day they arrived to The Berkshire, first through a blatantly racially discriminatory remark about Ms. Long and her children (Compl. ¶ 33), then by violently banging on their shared wall throughout the night (Compl. ¶ 32), and even by making baseless noise complaints that resulted in MPD involvement on numerous occasions.  Compl. ¶ 34.  Rather than address the harassment, Gables facilitated it (Compl. ¶ 5, 35, 45), and as a result of its failure to stop the harassment, Plaintiffs were forced to sleep outside their own home—either at a hotel or with friends and family—to avoid being harassed.   Compl. ¶ 88. The harassment Plaintiffs experienced on the basis of their race and familial status was so extreme that eventually Ms. Long moved out of the apartment due to the hostile housing environment. Compl. ¶¶ 4, 9, 32, 34, 85-86.

These facts are sufficient to meet Plaintiffs' burden at this stage because, construed in Plaintiffs' favor as they must be, they plausibly allege that the Long family was "[s]ubject[ed] . . . to harassment because of race . . . [and] . . . familial status . . . that cause[d] [them] to vacate a dwelling."  24 C.F.R. §100.60(b)(7).

---

42 U.S.C. §§ 3604(a) & (b) claims is appropriate because HUD's interpretation is "reasonable and consistent with the statutory purpose."   *Nat'l Fair Hous. All. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 57 (D.D.C. 2002) (*citing Associated Gas Distribs. v. FERC*, 899 F.2d 1250, 1260 (D.C. Cir. 1990)).

Similarly, the Complaint states a plausible claim for relief under 42 U.S.C. § 3604(b). Section 3604(b) prohibits harassment that results in material alteration to tenants, which effectively imposes "different terms, conditions, or privileges relating to the . . . rental of [their home]."  24 C.F.R. §100.65(b)(7).  Here, the question of whether this harassment by a neighbor materially altered the terms and conditions of Plaintiffs' housing is not a question that is appropriately resolved on a motion to dismiss where the court has to read the allegations in the Complaint in the light most favorable to the plaintiff.  *See Warren*, 353 F.3d at 37; *Dickens*, Civil Action No. 05-355 (EGS), 2007 WL 495801, at *2 (citation omitted).  Indeed, the Lease makes clear that tenants at The Berkshire should be able to enjoy their homes in relative "comfort" and free from "disturbances" that are considered violations of the Lease.  ECF No. 2 at 10.  Yet Plaintiffs were repeatedly denied this benefit due to the harassment they endured and Defendants' failure to stop it.  Compl. ¶¶ 32, 34, 37, 46-47, 48-53, 61-64.  Further, The Berkshire's alleged "quiet hours" policy was never included in the Lease, and Ms. Long alleges it either does not exist or was unequally enforced against her.  Compl. ¶ 60.  These facts are sufficient to support a "different terms and conditions" claim under Section 3604(b).

In its motion to dismiss (Mem. at 9-23), Gables makes several arguments to the contrary. None hold water.

*First*, Gables argues that to plead a claim under 42 U.S.C. § 3604(b), Plaintiffs must allege facially discriminatory rules regarding families who have children living with them.  Mem. at 11. This misstates the law.  Where a plaintiff alleges that a defendant arbitrarily enforces rules against kids, thereby precluding families with children from having equal use and enjoyment of the property, these facts suffice to state a claim for violating Section 3604(b).  *See, e.g. Jimenez v. David Y Tsai*, Case No. 5:16-cv-04434-EJD, 2017 WL 2423186, at *7 (N.D. Cal. June 5, 2017).

*Second*, Gables argues that the Court must engage at this stage in the burden-shifting framework from *McDonnell-Douglas*, as reflected in the Second Circuit's analysis in *Francis*, 992 F.3d 67.  Mem. at 12-13.  This argument also misses the mark.  As discussed *infra* at Section I.B, *Francis v. Kings Park Manor* is not persuasive.  Not only did HUD explicitly reject the underlying trial court decision, but it implemented regulations rejecting this analysis *after* having reviewed it.

Further, burden-shifting frameworks allocate burdens of proof; they do not set pleading standards.  *Ring*, 984 F.2d at 925-27; *Gill v. Mayor of District of Columbia*, Civil Action No. 07-64 (EGS), 2007 WL 1549100, at *3 (D.D.C. May 25, 2007) ("[T]his Court has never indicated that the requirements for establishing a prima facie case under *McDonnell-Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss.") (*quoting Swierkiewicz v. Sorema*, 534 U.S. 506, 511 (2002)).  The cases Gables cites reflect that the burden-shifting analysis Gables advocates is actually reserved for later stages of an action, not for a motion to dismiss.  *See, e.g.*, *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1264 (11th Cir. 2002) (analyzing burden-shifting at trial); *United States v. Plaza Mobile Ests.*, 273 F. Supp. 2d 1084, 1087, 1091-93 (C.D. Cal. 2003) (assessing burden-shifting at the summary judgment stage).

In short, Plaintiffs have met their burden to plead claims that Defendants made housing unavailable and discriminated in the terms and conditions of housing based on familial status or race.  The Court should deny Gables' motion as to Counts I, IV, and VII of Plaintiffs' Complaint.

## IV. PLAINTIFFS HAVE STATED A CLAIM UNDER 42 U.S.C. § 1981 BY ALLEGING THAT GABLES KNEW THEIR NEIGHBOR HARBORED RACIAL ANIMUS AND FAILED TO INVESTIGATE AND/OR TAKE ACTION BASED ON MS. LONG'S COMPLAINT ABOUT RACIAL HARASSMENT

Section 1981 of Title 42 of the U.S. Code prohibits racial discrimination in the making and enforcement of contracts, as well as all benefits of those agreements.  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013).  Courts analyzing § 1981 claims utilize pleading standards

similar to the anti-discrimination frameworks established by Title VII.  *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017).  Where a plaintiff pleads that a defendant was aware of the plaintiff's race and treated the plaintiff "less favorably" than those of another race, the plaintiff has raised its "right to relief above the speculative level."  *Nanko Shipping*, 850 F.3d at 467 (*citing Twombly*, 550 U.S. at 555).

A plaintiff's burden at the pleading stage is less onerous than at the summary judgement and trial stages.  *Nanko Shipping*, 850 F.3d at 467.  Accordingly, "[a]llegations regarding comparators, racial comments, and pretext obviously strengthen a discrimination complaint," but such evidentiary requirements are "inapplicable at the pleading stage."  *Id.*

The Complaint satisfies the pleading requirements for a Section 1981 claim, namely, alleging that Defendants knew of Ms. Long's race and treated her less favorably than other tenants because of it.  *Id.*  For example, in *Nanko Shipping*, the D.C. Circuit considered whether a plaintiff had stated a claim under § 1981 where the plaintiff alleged that defendant posed questions to the plaintiff company about its "background and capacity" that were not asked of other shipping companies.  *Id.* at 463.  The court held that because Nanko Shipping alleged that defendant Alcoa knew that Nanko's owners were not white, and treated them differently than white shipping companies, Nanko had elevated its "right to relief beyond a speculative level."  *Id.* at 467.

Here, just as in *Nanko Shipping*, both Gables and Ms. Long's neighbor were aware that she was Black.  Defendant Gables further knew Ms. Long's neighbor disliked living next to a Black resident, *because he told them so* the day after Ms. Long moved into The Berkshire.  Compl. ¶ 33.[14]  When Ms. Long complained to Gables about this derogatory comment, Gables did not take

---

[14]      Contrary to Defendants' assertion (Mem. at 18), this case is not like *Ndondji v. Interpark, Inc.*, where the Plaintiff's allegations were of national origin discrimination, and not race.  768 F. Supp. 2d 264, 272 (D.D.C. 2011).  Ms. Long has alleged facts that show "race was the reason" Gables failed to investigate and take action based on Ms. Long's complaint of racial harassment.  Compl. ¶¶ 35, 63.  *Cf. Ndondji*, 768 F. Supp. at 274 (finding plaintiff's

her complaint seriously.  Compl. ¶ 63.  Instead, when the same neighbor complained that her infant was crying, Gables threatened to evict Ms. Long if she could not stop the baby's crying.  Compl. ¶ 35.  After the neighbor made a 911 call because Ms. Long's infant was crying (Compl. ¶ 38), Gables could hear that there was no crying infant when they arrived at her unit.  Compl. ¶ 41.  Yet, knowing the animus of the neighbor who called MPD, Gables nevertheless opened Ms. Long's apartment door in the middle of the night for MPD, without a warrant or notice to Ms. Long, let alone her consent.  Compl. ¶ 44-45.  *See Nanko Shipping*, 850 F.3d at 467 (concluding plaintiff adequately alleged differential treatment by alleging that it was posed different questions than white-owned companies).

This racially hostile environment for Ms. Long was so severe that she and her family felt forced to stay somewhere other than her home on many occasions.  Compl. ¶ 88.  Plaintiff's Complaint includes allegations that permit the court, drawing reasonable inferences in Plaintiffs' favor, to find Defendants liable for violation(s) of § 1981 of the Civil Rights Act of 1866.  Accordingly, the Court should deny Gables' challenge to Count V.

## V.   PLAINTIFFS HAVE STATED A NEGLIGENCE CLAIM UNDER D.C. LAW

Plaintiffs have pled cognizable negligence claims (Count XII), and the Court should deny Gables' motion to dismiss them.  Any potential questions related to Defendants' liability are not applicable at this stage in the litigation as they would be questions of fact for the jury.

To state a negligence claim under D.C. law, a plaintiff must allege: "(1) the existence of a duty owed by the defendant to the plaintiff, (2) a negligent breach of that duty by the defendant, and (3) an injury to the plaintiff (4) proximately caused by the defendant's breach."  *Wall v.*

---

"occasional reference to his race in his amended complaint" insufficient to make a § 1981 claim, which requires "some facts that demonstrate . . . race was the reason for [a] defendant's actions").

*Reliance Standard Life Ins. Co.*, Civ. No. 20-2075 (EGS), 2021 WL 2209405 at *9 (D.D.C. June 1, 2021) (*quoting Powell v. District of Columbia*, 602 A.2d 1123, 1133 (D.C. 1992)); s*ee also Girdler v. United States*, 923 F. Supp. 2d 168, 187 (D.D.C. 2013) (identifying the same elements) (citation omitted).

A landlord has a duty "to exercise ordinary care to keep [its property] free from [dangerous] conditions," and specifically those of which it has notice. *Youssef v. 3636 Corp.*, 777 A.2d 787, 794 (D.C. 2001) (*quoting Pessagno v. Euclid Inv. Co.*, 112 F.2d 577, 579 (D.C. 1940)). The question of whether a condition is dangerous, or the landlord was aware of it, is "a question for the jury." *Charles v. Home Depot, U.S.A., Inc.*, No. 16-CV-2054 (EGS), 2019 WL 95563, at *2 (D.D.C. Jan. 3, 2019) (*quoting District of Columbia v. Cooper*, 445 A.2d 652, 655 (D.C. 1982)); s*ee also Lynn v. District of Columbia,* 734 A.2d 168, 172 (D.C. 1999) (assessment of negligence is "normally [a] question[] of fact for the jury") (*quoting D.C. Transit Sys., Inc. v. Harris*, 284 A.2d 277, 279 (D.C. 1971)).

A.    **Plaintiffs Allege Multiple Sources of Gables' Duties to Maintain and Repair the Long's Residence**

In the housing context, a landlord's duties may have a statutory source, arise from the common law, or arise from contract. Here, all three sources provide Gables' duties to repair two specific items in Plaintiffs' apartment—the broken closet door and a faulty window screen—after Ms. Long requested they be fixed.

The Lease identifies and acknowledges both contractual and statutory duties of Gables to repair and maintain its premises. ECF No. 2. For example, clause 26 in "Responsibilities of Owner and Tenant" addresses the "Responsibilities of Owner," stating that it will "make all reasonable requested repairs required by this Lease . . ." ECF No. 2 at 12. Similarly, Clause 23.D, contained in a section entitled "While You're Living in the Apartment," speaks to the "Reasonable

purpose[s]" for which the Landlord may enter the apartment.  ECF No. 2 at 12.  These include reasons "directly related to the Landlord's duty to . . . make necessary or agreed repairs … [or] maintenance."  ECF No. 2 at 12.

Gables attempts to side-step its responsibilities by asserting that it has no duty of any kind, from any source, and that it could not be responsible for any request for repairs to Ms. Long's unit, unless Ms. Long submitted those requests in the manner identified in one section of the Lease, which instructs tenants to use the tenant portal, or submit the request in a signed writing, to Gables' "designated representative."[15]  Mem. at 30-31; ECF No. 2 at 11.  Gables argues that the Complaint did not plead with specificity how Ms. Long complied with this provision, and that the negligence claims should therefore be dismissed.  Mem. at 30-31.  This argument fails for at least five reasons.

*First*, the Lease is not as definitive as Gables argues.  Gables points to one provision regarding submission of requests (Mem. at 30-31; ECF No. 2 at 11), but entirely ignores multiple other Lease provisions that identify other ways to report items needing repair.  For example, the "Policies and Regulations" section of the Lease states that "[r]outine maintenance requests may be submitted to the office in person, via phone, email or Gables Gateway."  ECF No. 2 at 50.  Thus, even if Gables' original assertion—that, in order for Gables to have a duty to repair, Ms. Long had to "submit the request in writing," and plead how she did so, and to whom she submitted the request (Mem. at 30)—were correct (and the assertion is not correct), Gables' own policies contained in the Lease negate that argument or, at minimum, create a factual issue about it that should not be resolved or analyzed at this stage in the litigation.

---

[15]     Although this clause purports to require repair requests be delivered via signed writing to a "designated representative," no such person(s) are identified in the Lease.

*Second*, as alleged in the Complaint, once Ms. Long retained counsel, Gables instructed her to submit maintenance requests through counsel.  Compl. ¶ 76.  Thus, Gables further modified its own policies by its own conduct.[16]

*Third*, Plaintiffs are aware of no case law, and Gables identifies none, suggesting that a landlord who has been told of a hazardous condition may avoid liability, as a matter of law, for failure to repair that condition, simply because of the method by which the landlord was notified of it.  Indeed, whether a landlord was aware of a particular issue is generally a question for the fact-finder and thus not properly before the Court at this stage.  *Charles*, 2019 WL 95563, at *2 ("[W]here there is evidence upon which reasonable persons might differ as to negligence and other elements of liability, those questions must be decided by the jury.") (*quoting Cooper*, 445 A.2d at 665).  A complaint states a plausible claim for relief when it contains sufficient factual matter that, when construed in plaintiff's favor, permits the Court to "draw the reasonable inference that defendant is liable for the misconduct alleged."  *See Iqbal*, 556 U.S. at 678 (2009); *Twombly*, 550 U.S. at 556.

Moreover, the case law actually supports a fact-finder, at the appropriate time, reaching the opposite conclusion.  For example, *Youssef* addressed the question of whether a landlord was liable for a slip and fall accident based on its constructive (but not actual) knowledge of a dangerous condition.  *Youssef*, 777 A.2d at 791.  The D.C. Court of Appeals vacated the directed verdict in the landlord's favor, because whether the landlord: (1) had notice; and (2) exercised reasonable care in responding should have been decided by the jury.  *Id.* at 794-95.  Thus, Gables' contention that a request for repairs must have been submitted via the exclusive manner it highlighted (Mem.

---

[16]     To the extent Gables is arguing either that it did not instruct Ms. Long to submit maintenance requests through counsel, or that it never received any maintenance requests, both scenarios present questions of fact beyond the scope of Gables' motion to dismiss.

at 30-31) is inconsistent with D.C. law.  And, the fact that other portions of the Lease identify additional methods of notification further highlights the factual assessments regarding Gables' actual or constructive knowledge that a jury must make at trial here.

 *Fourth*, the Lease incorporates certain statutory provisions from the D.C. Housing Code in addenda.  ECF No. 2 at 28-35.  Section 301.1, the "Implied Warranty and Other Remedies" section, specifies that there is an implied warranty of habitation that the landlord will maintain the premises "in compliance with this subtitle."  ECF No. 2 at 29.  Section 301.2 of the D.C. Code specifies that the rights, duties, and remedies of this chapter of the Code do not preclude a court from determining that something not specifically addressed in the chapter is "contrary to public policy, or unconscionable, or otherwise unlawful."  ECF No. 2 at 29.  Accordingly, Gables' argument— that it is only required to complete repairs if a tenant seeks them in a specific manner—is inconsistent with the D.C. Housing Code, which Gables also incorporated directly into the Lease.  *George Washington University v. Weintraub,* 458 A.2d 43, 48-49 (D.C. 1983) (holding that a landlord is liable for violations of the housing code that they are aware of).

 *Fifth*, and finally, D.C. courts have held that housing regulations "impose maintenance obligations upon [landlords] which [they are] not free to ignore.  *Kanelos v. Kettler*, 406 F.2d 951, 953 (D.C. 1968).  These are "part of the law of the forum."  *Banks v. B.F. Saul Company*, 212 A.2d 537, 540 (D.C. 1965).  Indeed, the specific language in the D.C. housing regulations "contemplates more than mere basic repairs and maintenance . . . its purpose is to include repairs and maintenance designed to make a building or neighborhood healthy and safe," which are in addition to those "repairs and maintenance to keep out the elements."  *Clarke v. O'Connor*, 435 F.2d 104, 110 (D.C. 1970).[17]  This language from the D.C. housing code has been held to impose

---

[17]  Although the statutory numbering has changed, the language of this provision is exactly the same as it was in *O'Connor* and *Kanelos*.  *Compare Kanelos*, 406 F.2d at 953 (analyzing what formerly was D.C. Housing Code §

on a landlord a "duty of care towards (his) tenants." *O'Connor*, 435 F.2d at 110 (alteration in original).[18]  This is a duty that D.C. courts recognized over fifty years ago, and it was certainly applicable to Defendant Gables here upon learning of the need to repair the broken closet door and secure the window screen, regardless of how Gables learned of those needed repairs.

Plaintiffs' well-pled facts provide notice of the basis of Defendants' duties, as well as breach of those duties, to the Defendants.

### B.    Gables' Arguments Present Only Questions of Fact, and the Court Should Deny the Motion to Dismiss on These Grounds

The Complaint sufficiently pleads causation.  Only in "exceptional cases" will a determination of causation in a negligence case move "from the realm of fact to one of law." *Banks*, 212 A.2d at 540.  This is not one of those "exceptional cases."

### 1.    Gables' causal challenge to the claim for injury to L.L. from the closet door presents questions of fact

The Complaint alleges that Ms. Long requested that Gables repair a closet door in her residence, that Gables failed to do so, and that when the unrepaired door fell, it injured her newborn son, L.L.  Compl. ¶¶ 77-78, 92.  Gables urges the Court to view Gables' failure to repair the closet door as requested, which then fell onto L.L. as a result of its disrepair, as presenting a *res ipsa loquitur* scenario (Mem. at 30-31), albeit one in which Gables seems to argue Ms. Long's request for repair of the broken closet door never happened, and Gables' duties to maintain and repair the unit do not exist.  Mem. at 30-31; Compl. ¶¶ 77-78, 92, 209.

---

2501) and *O'Connor*, 435 F.2d at 110 (same), *with* 14 DCMR § 700.1 (current regulation), *available at* https://dcregs.dc.gov/Common/DCMR/RuleList.aspx?ChapterNum=14-7.

[18]    As the court in *O'Connor* noted, where, as here, the public policy has been enacted in the housing code, such policy informs the "expectations and intentions of most people." *O'Connor*, 435 F.2d at 110 n.15.  Provisions of such "general applicability" are not something of which landlords might be unaware. *Id.*

While a flour barrel falling from a second-story hay loft this is not, *Byrne v. Boardle*, 2 Hurl. & Colt. 722, 159 Eng. Rep. 299 (1893), any decision on an evidentiary instruction of this nature is woefully premature.  As the court in *Speights v. 800 Water Street, Inc.* pointed out, in negligence cases, circumstantial evidence may be sufficient, and in some cases, it "may be more certain, satisfying, and persuasive than direct evidence."  4 A.3d 471, 475-76 (D.C. 2010) (internal citation and marks omitted).  At a minimum, this is not a basis on which to dismiss a negligence claim as a matter of law, pursuant to F.R.C.P. 12(b)(6).

The remainder of Gables' argument presses similar questions of fact.  Gables identifies for the Court three elements a hypothetical plaintiff would have to overcome, including that the incident "must not have been due to any *voluntary action or contribution* on the part of the plaintiff."  Mem. at 31 (emphasis added) (*citing Hailey v. Otis Elevator Co.*, 636 A.2d 426, 428 (D.C. 1994)).  But D.C. courts have long made clear that "only in exceptional cases [do] questions of negligence, contributory negligence, and proximate cause pass from the realm of fact to one of law."  *Banks*, 212 A.2d at 540 (reversing and remanding where trial court refused to take judicial notice of housing code regulations that required the landlord to keep the premises in good repair, the landlord failed to make requested repairs to the brackets holding up blinds, and the blinds fell and injured the tenant, because liability was a question of fact).  Similarly, in *Speights*, the court held that proximate cause is "ordinarily a question of fact for the jury" and "[o]nly if there were absolutely no facts or circumstances from which a jury could reasonably have found that [defendant] w[as] negligent and that such negligence was the proximate cause of the injury, would the question have been one for the court."  4 A.3d at 475 (internal citations omitted).

The Court should reject Gables' challenges to the negligence claims for injuries to L.L., which present questions of fact and premature evidentiary instructions.  Neither is appropriately

resolved on a motion to dismiss. The operative question on a motion to dismiss is whether the pleading "contains sufficient factual matter that, when construed in plaintiff's favor, permits the Court to 'draw the reasonable inference that defendant is liable for the misconduct alleged.'" *Iqbal*, 556 U.S. at 678.

### 2. Gables' causal challenge to the claim for injury to M.L. from the unrepaired window screen presents questions of fact

There are relatively few cases in D.C. that allege claims involving negligence after an individual has fallen from a window, and they all have one thing in common: each presented questions of fact, beyond the scope of a motion to dismiss. The same holds true in this case; the questions of fact posed by M.L.'s negligence claim cannot be resolved at this stage.

The few cases that have addressed similar factual scenarios to the present case are instructive.

In *Gould v. DeBeve*, the Court of Appeals for the District of Columbia reviewed a jury verdict in favor of a child who, at age 18 months, fell from a third-story apartment window. 330 F.2d 826, 827 (D.C. 1964). As the court explained, the lease in question required the landlord to make required repairs, there was "uncontradicted testimony" that the window screen was damaged, and there was further testimony that the apartment residents notified the defendants of the issue with the screen and "requested that suitable repair or replacement be made." *Id.* at 827-28.

The Court of Appeals explained in upholding the verdict:

Defendants were in the business of owning and operating rental housing. By their own contractual undertaking, as well as by reason of legislative command, they were obligated to provide and maintain decent and safe quarters . . . [t]hat obligation certainly comprehends, in the Washington summer when windows must be raised, screens which keep flies out and young children in. There was substantial evidence that the screen was defective in respect of its safety function; and there was also corroborated testimony . . . that defendants had repeatedly been notified of the dangerous condition of the screen and requested to discharge their obligations with respect to it. These requests were ignored, and what was feared would happen did happen.

38

*Id.* at 829-30.

Of additional import here, the *Gould* court explicitly rejected the exact same argument Gables urges the Court to accept now—that the window screens required by the D.C. Housing Code are only "meant to exclude insects" and "contain no requirement at all that a landlord provide a safety screen that will prevent falls." Mem. at 32. The defendants in *Gould* made precisely the same argument, based on the predecessor version of the same D.C. Housing Code section, which required then and now that screens: (1) be in place from March 15 to November 15; and (2) effectively keep insects out. *Gould*, 330 F.2d at 828 n.2.

The D.C. Court of Appeals flatly rejected defendant's argument, explaining "[t]hat the Housing Code may perhaps concern itself only with flies does not define the duties owed to children under the general law of negligence," and confirming that the trial court correctly found that particular section of the housing code "neither pertinent nor relevant" since there was "no issue as to the efficacy of the screen in terms of insects and no basis for allowing municipal sanitation requirements to fix the outer limits of responsibility under the law of torts." *Id.*

Gables' attempts to distinguish this case based on the month in which Plaintiff M.L. fell from the window (Mem. at 33) ignores the opinion of the Court, which rejected this premise.[19] Similarly, the negligence law of other jurisdictions (Mem. at 31-32) is irrelevant here, particularly where the specific issue has been long-settled in this jurisdiction.

---

[19]     Defendants' other case, *Stevens v. Willis*, 175 A.2d 600, 601 (D.C. 1961), similarly confirms that the kind of negligence claim the Complaint pleads presents questions of fact, and that courts have previously held landlords liable for negligence where a child fell from a residential window after failing to provide or repair a window screen. The Court need not take Defendants' bait to rule on these questions of fact. What matters at this juncture is that Plaintiffs pleaded "sufficient factual matter that, when construed in plaintiff's favor, permits the Court to 'draw the reasonable inference that [Gables] is liable' for its negligence, specifically by failing to repair the window screens that led to the breach and the injury. *See Iqbal*, 556 U.S. at 678.

To the extent there are questions regarding whether or not Gables' failure to make requested repairs was the proximate cause of the injuries to the minor plaintiffs M.L. and L.L., those are questions of fact appropriately saved for a subsequent stage of the litigation. *See Iqbal*, 556 U.S. at 678. Similarly, if "reasonable persons might differ" about evidence supporting the elements of liability, "those questions must be decided by the jury." *Cooper*, 445 A.2d at 655. In short, Gables does not contest the harms Plaintiffs allege. At most, Gables' challenge to Plaintiffs' negligence claims highlight questions of fact that are improperly raised on a motion to dismiss and issues for discovery. The Court should therefore deny Gables' motion as to Plaintiffs' negligence claims.

## VI.  THE COMPLAINT PLEADS A COGNIZABLE BREACH OF CONTRACT CLAIM

Gables moves to dismiss Plaintiffs' breach of contract claims on the basis that Plaintiffs cannot recover damages on these claims. Gables' argument conflicts with the relevant legal precedent and mischaracterizes Ms. Long's claim.

The elements of a breach of contract claim are: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 48 (D.D.C. 2017) (*quoting Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014)). "[T]o state a claim for breach of contract so as to survive a Rule 12(b)(6) motion to dismiss, it is enough for the plaintiff to describe the terms of the alleged contract and the nature of the defendant's breach." *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015). *See also Attias v. CareFirst, Inc.*, 518 F. Supp. 3d 43, 52 (D.D.C. 2021) (same). Furthermore, "the absence of specific monetary injury does not prevent the accrual of a cause of action for breach of contract [because e]ven where monetary damages cannot be proved, a plaintiff

who can establish a breach of contract is entitled to an award of nominal damages." *Wright v. Allen*, 60 A.3d 749, 753 (D.C. 2013).

Gables has not argued that the Lease is invalid, or that it is not a contract between Ms. Long and Defendants.  The Lease (ECF No. 2) contains numerous provisions outlining obligations between the parties, as discussed above in Section V.  The Complaint alleges breach of some of those obligations by Defendants Gables and the Berkshire Defendant, as a result of which Plaintiffs were harmed.  As discussed above, and contrary to Gables' arguments (Mem. at 34-36), Plaintiffs have stated a claim for breach of contract.

In addition, the Complaint pleads breaches of other provisions of the Lease by which Plaintiffs also suffered damages.  For example, several provisions of the Lease address "noise," "disturbing or threatening the … safety, or convenience" of tenants.  *See, e.g.*, Compl. ¶¶ 28-29, 31.  The Complaint alleges that, as a result of the harassment and hostile living environment created, in part, by Defendants' failure to take steps to curb the disturbance and harassment of Plaintiffs, Plaintiffs felt unsafe and unable to stay in their home, and as a result stayed at hotels, or at times with family and friends.  Compl. ¶ 88.  *See also* ¶ 83 (Gables' actions resulted in Ms. Long's lack of enjoyment in her unit.).  Ms. Long incurred substantial costs as a result of Defendants' actions and failure to uphold its obligations under the lease, in addition to the inconvenience and difficulty of having to leave her own home with her small children.  Compl. ¶¶ 88, 90.

The Lease also contains provisions governing tenant parking and the obligations of the "Owner," including providing parking stickers for tenant vehicles.  ECF No. 2 at 37.  Yet, as alleged, Gables staff refused to issue Ms. Long a parking pass (part of its differential treatment and retaliation), and did so only after the involvement of counsel.  Compl. ¶ 74.

The Complaint alleges numerous well-pled facts to support a finding that Defendants breached the Lease, damaging Plaintiffs.  In addition to the monetary damages sought, numerous allegations in the Complaint support non-monetary relief, or nominal damages.  *Wright*, 60 A.3d at 753 & n.3.

The remainder of Gables' argument urging the Court to dismiss Ms. Long's breach of contract claims raises theories *not* advanced by Plaintiffs for recovery, particularly as a result of breach of contract.  Specifically, Ms. Long does not allege a claim for negligent or intentional infliction of emotional distress as a result of Gables' breach of contract, or as an independent claim (Mem. at 35), although she certainly suffered emotional distress as a result of Gables' misconduct.  Compl. ¶ 91.[20]

For all of these reasons, the Court should deny Gables' motion to dismiss Ms. Long's breach of contract claims.

## VII.    THE COMPLAINT PLEADS A COGNIZABLE CLAIM FOR TRESPASS

The Court should similarly deny Gables' motion to dismiss a portion of the trespass claim, Count XIII of the Complaint.

Trespass under D.C. law is "the intentional intrusion of a person or thing upon property that invades and disrupts the owner's exclusive possession of that property."  *Garay v. Liriano*, 943 F. Supp. 2d 1, 25 (D.D.C. 2013) (*quoting Morgan v. Barry*, 12 Fed. App'x. 1, 3 (D.C. Cir. 2000)).  Thus, to state a claim for trespass, a plaintiff must allege: (i) an unauthorized entry; (ii) onto or into plaintiff's property; and (iii) that the unauthorized entry interferes with the plaintiff's possessory interest.  *Robinson v. Farley*, 264 F. Supp. 3d 154, 163 (D.D.C. 2017).  As

---

[20]    As reflected in Compl. ¶ 91, Ms. Long's emotional distress was a result of the hostile housing environment and trespasses, which caused her to seek additional therapy.  Accordingly, Gables' arguments regarding the availability of damages for emotional distress arising from a breach of contract are misplaced.  Mem. at 35.

D.C. courts recognize, "[a] trespass by way of an entry by the actor in person may be a mere momentary invasion." *Robinson*, 264 F. Supp. 3d at 164 (internal citation and punctuation omitted).

The Complaint alleges that Gables is liable for trespass because its agents intentionally granted entry to the Long family residence without authorization on at least two occasions, and the Complaint describes each such occasion in detail. Compl. ¶¶ 37-45, 48-56. This is sufficient to state a claim for trespass in the District of Columbia.

Gables urges the Court to dismiss the trespass claim by reference to only one of the two times its agents facilitated the unauthorized, warrantless entry of MPD into the Long residence—the first one, which occurred in the middle of the night. Mem. at 36. Gables, "presum[ing]" that the police wanted to enter the apartment "to confirm that the infant was alive" (Mem. at 36),[21] urges the Court to accept Gables' presumption, and conclude, as a matter of law, that Gables' agents did not trespass when they opened the Long family's apartment in the middle of the night.

Gables provides no legal authority supporting its presumptions, but rather points to a Lease provision regarding times and conditions under which the landlord may enter the apartment. Mem. at 36. Gables argues that, when Ms. Long awoke to police outside her bedroom at approximately 2:00 am (Compl. ¶ 37): (1) the situation was an "emergency" as envisioned in the Lease; and/or (2) a "wellness check" under these circumstances was a *per se* emergency, simply because of the manner in which police were summoned, even though the conditions which supposedly brought the police to the unit no longer existed. The Lease does not define "emergency" (ECF No. 2 at

---

[21]     Defendant Gables' arguments, particularly regarding this incident, ignore the entire context in which it happened, as reflected in the Complaint and Section(s) I-IV above. Specifically, Gables' arguments ignore that immediately after moving in, Ms. Long's neighbor made a racist comment, challenging Gables staff as to why they were letting Black people live in the building. Compl. ¶ 33. The fact that, days later, the neighbor called 911 in the middle of the night about a crying infant is part of the same harassment and overall hostile housing environment for the Long family. Compl. ¶ 38. *See* Section I.

11), and Defendant provides no legal support for its assertion that this situation qualified.  At best, the Lease's use of the term "emergency" is ambiguous, making its meaning "a question of fact." *Wharf, Inc. v. D.C.*, 133 F. Supp. 3d 29, 42 (D.D.C. 2015) (*quoting Flynn v. Dick Corp.*, 481 F.3d 824, 831 n.7 (D.C. Cir. 2007)).

Further, even if a party is permitted to enter a property under certain conditions, that privilege only exists if the condition or basis for the entry actually exists.  *Council on Am.–Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 345 (D.D.C. 2011).  Where, as here, a party has alleged that the trespasser exceeded the scope of authorization for entry, that is "sufficient to state a claim for trespass."  *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 119 (D.D.C. 2018) (denying motion to dismiss where plaintiff alleged unauthorized entry).

In short, Gables' argument boils down to this: if the police showed up without a warrant, *said* they were responding to a 911 call, and wanted to go into the Long residence, then, in Gables' view, Gables had *no obligation to try to contact the tenant so as to avoid barging into her home unannounced in the middle of the night*.  And further, that even construing all the alleged facts in Plaintiff's favor, there is no possible legal basis to hold Gables liable for trespass in this situation.

There is no basis for the Court to accept Gables' presumptions as part of the argument it urges, nor is such a conclusion supported as a matter of law.  Gables' motion to dismiss the trespass claim based on the middle-of-the-night entry to the Long residence should be denied.

As Gables does not seek dismissal of the trespass claim based on the second unauthorized entry, that claim should proceed as well.

**LEAVE TO AMEND**

If the Court finds any of Plaintiffs' claims lacking in some respect, Plaintiffs respectfully request permission to file a motion for leave to amend, with a proposed amended complaint correcting any deficiencies.

**CONCLUSION**

For the foregoing reasons, Plaintiffs urge the Court to deny Defendant Gables' Motion to Dismiss in its entirety.

June 9, 2023                              Respectfully submitted,

/s/ Catherine Cone
Catherine Cone (D.C. Bar No. 1032267)
(catherine_cone@washlaw.org)
Brook Hill (D.C. Bar No. 1044120)
(brook_hill@washlaw.org)
**Washington Lawyers' Committee for Civil Rights and Urban Affairs**
700 14th Street, NW, Suite 400
Washington, DC  20005
Telephone:  202-319-1000
Fax:  202-319-1010

/s/ Brian D. Koosed
Brian D. Koosed (D.C. Bar No. 1034733)
**K&L Gates LLP**
1601 K Street NW
Washington, D.C. 20006
Tel:     202-778-9000
Fax:    202-778-9100
E-mail: brian.koosed@klgates.com

*Counsel for Plaintiffs*

45

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 9, 2023, a true copy of the foregoing and following was electronically filed through the Court's CM/ECF system, which served it on counsel of record identified on the below service list.

| | |
|---|---|
| Eric J. Pelletier<br>Anders T. Sleight<br>**Offit Kurman, P.A.**<br>7501 Wisconsin Avenue, Suite 1000W<br>Bethesda, MD 20814<br>Email: epelletier@offitkurman.com<br>anders.sleight@offitkurman.com | D. Stephenson Schwinn<br>**Jordan Coyne LLP**<br>10201 Fairfax Boulevard, Suite 520<br>Fairfax, Virginia 22030<br>Email: s.schwinn@jocs-law.com |

/s/ Brian D. Koosed
**K&L Gates LLP**
1601 K Street NW
Washington, D.C. 20006
Tel:     202-778-9400
Fax:     202-778-9100
E-mail: brian.koosed@klgates.com

*Counsel for Plaintiffs*